**BAL THEATRE CORPORATION,**
Plaintiff,

v.

**PARAMOUNT FILM DISTRIBUTING CORP. et al., Defendants.**

**BAL THEATRE CORPORATION,**
Plaintiff,

v.

**UNITED CALIFORNIA THEATRES, INC., et al., Defendants.**

**Nos. 34705, 35663.**

United States District Court
N. D. California, S. D.

June 15, 1962.

Joseph L. Alioto, Maxwell Keith, San Francisco, Cal., for plaintiff.

M. Mitchell Bourquin, Michael N. Khourie, San Francisco, Cal., for defendant.

OLIVER J. CARTER, District Judge.

There are pending before the Court in the above-entitled actions motions for judgment notwithstanding the verdicts, or in the alternative for a new trial.

Action #34705 charges a conspiracy to restrain and monopolize trade and commerce in violation of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S. C.A. §§ 1 and 2; and action #35663 charges a conspiracy to restrain trade in violation of Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1.

The defendant United California Theatres, Inc., hereinafter referred to as "defendant", or "United California", on behalf of itself and its constituent corporations by merger, Golden State Theatre and Realty Corporation and T & D Jr.

Enterprises, Inc., is the moving party. This defendant is a corporation which operates in excess of one hundred theaters in Northern California, including the Ritz and Hayward Theatres in Hayward, the Del Mar Theatre in San Leandro, the Lorenzo Theatre in San Lorenzo, and two drive-in theaters in the same area, all in the so-called East Bay Area adjacent to and south of the City of Oakland in the San Francisco Bay portion of California. The plaintiff operates a single theater, called the Bal Theatre in San Leandro, California. Both plaintiff and defendant, United California, are exhibitors of motion pictures, and the other defendants are so-called distributors of motion pictures.

In action #34705 the complaint charges that defendant, United California, and its constituent corporations, conspired with the named distributor corporations [1] to prevent plaintiff from receiving motion pictures for exhibition at its Bal Theatre on a 14-day availability after downtown Oakland closing, and to deny plaintiff its competitive position on runs and clearances by the defendant distributors fixing plaintiff's availability and granting clearances over plaintiff's theater to United California's theaters, without regard to the relative grossing possibility, location and appointments of the plaintiff's and United California's theaters, and refusing plaintiff licenses to exhibit on a 14-day basis, and by United California's coercive use of its buying power to negotiate and obtain licenses in "open towns" (competitive areas) upon the basis of granting licenses in "closed towns" (where no competition existed).

In action #35663 the complaint charged that the defendant United California, as an exhibitor, and Twentieth Century-Fox Film Corporation, hereinafter referred to as "Fox", as a distributor, conspired to prevent plaintiff from obtaining equipment with which to show cinemascope product before it was shown by United California by the process of fixing of availabilities and the granting of clearance over plaintiff's theater to United California by Fox, and the coercive use of its buying power by United California.

All the distributor defendants have been dismissed from these actions as the result of a covenant not to sue entered into between plaintiff and the distributor defendants, and the exhibitor defendants represented by United California are the only defendants remaining in these cases. The actions were consolidated for trial, and were tried to a jury, which rendered a general verdict for the plaintiff in both actions, in the sum of $153,500 in action #34705, and in the sum of $6,800 in action #35663. These verdicts were trebled, making a judgment of $20,400, plus attorney's fees and costs in action #35663. In action #34705 the amount of $25,000 (the amount previously paid to the plaintiff by the distributor defendants in consideration for the covenant not to sue), and $17,000 (the amount determined by the jury to be the value of certain playing rights granted by the distributor defendants to plaintiff in the covenant not to sue), or a total of $42,000, was deducted from the sum of $460,500 (the trebled verdict), leaving a judgment of $418,500, plus attorney's fees and costs.

The defendant has made motions for judgment notwithstanding the verdicts, or for a new trial. It is the Court's view that these motions must be denied, and that the real issue is presented on defendant's motions for a new trial. As is usual, the defendant attacks the sufficiency of the evidence to sustain the charge of conspiracy, and some of the rulings of the Court on the admissibility of evidence, and the soundness of the instructions given by the Court, and the failure of the Court to give certain

1. Paramount Film Distributing Corporation; Loew's Incorporated; Warner Bros. Pictures Distributing Corporation; Twentieth Century-Fox Film Corporation; National Theatres Corporation; Fox West Coast Theatres; Republic Pictures Corporation; Columbia Pictures Corporation; Universal Film Exchanges, Inc.; United Artists Corporation.

instructions requested by defendant. The Court is satisfied that the question of whether there was a conspiracy within the charges set forth in the complaints was a question of fact for the jury, and that there was substantial evidence that the defendant conspired with the distributor defendants to suppress plaintiff's competition. The Court is further satisfied that the rulings on evidence were properly made, and that no error was made in the case which substantially prejudiced the rights of defendant. And, finally, the Court is satisfied that the instructions given on the issues in the case were in accordance with the principles of law set forth in the many reported cases dealing with this kind of anti-trust situation. Therefore, the Court is not going to add to the plethora of literature on the exhibitor-distributor type of motion picture anti-trust case, other than to say that the evidence is sufficient to support the verdicts of the jury, and that there were no errors of law on the admission of evidence, and giving of the instructions, in the general aspects of these cases, nor were the general verdicts of the jury excessive in the light of the evidence, and the principles laid down in the decided cases discussing the measure of damages in movie anti-trust cases.

However, there are three points raised in the various motions for a new trial which require consideration because of their novelty, or because they are directed specifically to the discretion of the trial judge apart from reviewing the verdicts of the jury. These three points are (1) the matter of the claimed inconsistency between the value of the playing rights granted in the covenant not to sue by the distributors to plaintiff as fixed by the jury in response to a special interrogatory and the general verdict in action #34705, and how the benefits received by the plaintiff from the distributor defendants as the result of the covenant not to sue should be set off against the judgments against the defendant United California; (2) the matter of fixing attorney's fees; and (3) the matter of the claimed misconduct of a juror in allegedly concealing material facts upon his voir dire examination.

## I

## THE CLAIMED INCONSISTENCY BETWEEN THE ANSWER TO THE INTERROGATORY AND THE GENERAL VERDICT IN ACTION 34705, AND THE COMPUTATION OF TREBLE DAMAGES.

The background to this area of the controversy stems from a partial settlement of the actions evidenced by a covenant not to sue entered into between plaintiff and the distributor defendants after the actions had been filed, and after the damage periods in controversy had terminated. The covenant not to sue was entered into on September 17, 1956, and the period of suit in action #34705 was June 15, 1952, to June 15, 1955, and in action #35663 was July 12, 1952, to July 12, 1956.

As a result of the covenant not to sue the distributor defendants paid the plaintiff the sum of $25,000 for the dismissal of both of these actions without prejudice and without costs by the plaintiff against the distributor defendants. As a part of the covenant not to sue and evidenced by letters dated September 17, 1956, from the various distributor defendants to plaintiff, the distributor defendants offered certain playing rights to plaintiff. These playing rights were described in the letters as "* * * the opportunity to bid competitively for licenses of our pictures against the Ritz and Hayward Theatres on their availability. That availability is now 14 days after Oakland first-run closing. Bidding will be subject to all the usual terms and conditions governing our bidding procedure. We reserve the right to permit other theatres to bid for the same availability against the Bal, Ritz and Hayward Theatres, or any of them." At the trial at the request of the defendant, United California, and over the objection of plaintiff, the Court propounded a special interrogatory to the jury to determine the monetary value of the playing rights granted by the distributor defend-

ants to the plaintiff.[2] In answer to the interrogatory the jury determined the value of the playing rights to be $17,000. After the return of the verdict and the answer to the interrogatory, the defendant moved for a new trial under the provisions of Rule 49(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. upon the ground of the inconsistency between the answer to the special interrogatory and the general verdict. In this respect defendant's contention is that the general verdict of $153,500 for the period in suit (three years from 1952 to 1955), and the $17,000 value for the playing rights granted on September 17, 1956, although for different periods of time, are evaluations of essentially the same rights, namely, the right of the Bal Theatre to compete on an even basis with the defendant's Ritz and Hayward Theatres for motion picture products of the distributor defendants, and that the disparity in valuation is so great as to create an irreconcilable inconsistency between the verdict and the answer to the interrogatory. Rule 49(b) provides:

"When the general verdict and the answers are harmonious, the court shall direct the entry of the appropriate judgment upon the verdict and answers. When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may direct the entry of judgment in accordance with the answers, notwithstanding the general verdict or may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry

of judgment but may return the jury for further consideration of its answers and verdict or may order a new trial."

The Court concluded that the general verdict and the answer to the interrogatory were harmonious and entered a judgment upon the verdict and the answer, and denied defendant's motion to enter judgment in accordance with the answer to the interrogatory, or for a new trial.

The claimed inconsistency is more apparent than real. On the issue of damages for the claimed damage period of three years from 1952 to 1955 the jury had before it the evidence of the financial result of the operation of plaintiff's Bal Theatre before, during and after the damage period, and also the financial result of the operation of defendant's competing theaters, namely, the Ritz and Hayward Theatres in Hayward, the Del Mar Theatre in San Leandro, and the Lorenzo Theatre in San Lorenzo. One of the plaintiff's contentions was that the Bal Theatre was entitled to a competitive position with defendant's Ritz tnd Hayward Theatres, and that plaintiff's damages should be determined by the profit it would have made had it been in the same position as the Ritz and Hayward Theatres. Therefore defendant contends that the value of the playing rights granted on September 17, 1956, is the true meaure of the damages to plaintiff for the damage period. In this contention the defendant attempts to bypass the obvious difference in time of the periods of valuation involved in the answer to the interrogatory on the one hand (September, 1956) and the general verdict on the other (1952–1955). The contention also ignores the plaintiff's argument that it was entitled not only to the

---

2. The interrogatory reads as follows:

"If, and only if, you find that plaintiff is entitled to a verdict against the defendant, you will and are hereby instructed to enter in the place provided for your answer to the following interrogatory.

"Interrogatory: What was the fair and reasonable value in terms of money of the opportunity granted Bal Theatre by the distributors on or about September 17, 1956, to bid competitively with the Ritz and Hayward Theatres and any other theaters acceptable to the distributors for license of the distributors' pictures upon an availability of 14 days after Oakland first-run closing?

"Answer: $17,000.00."

right to bid competitively on a fourteen-day availability, but it was entitled to the right to play on the fourteen-day availability as distinguished from the right to bid, and that, therefore, the playing right granted was not the same as the rights of which the plaintiff claimed it was deprived as the result of the conspiracy and the monopolization alleged in the complaint.

■ The Court agrees with the plaintiff in both of these contentions, and finds that the damages awarded in the general verdict were for a different period of time and for different rights than the valuation of the playing rights fixed in the answer to the special interrogatory. The criteria for determining plaintiff's damages for the damage period is what would plaintiff have earned in the absence of the violation of the anti-trust laws during the period involved, and the criteria for the answer to the special interrogatory was what was the value of the limited playing rights granted by the distributor defendants to the plaintiff in the covenant not to sue.

The parties are in agreement that the sum of $25,000 paid by the distributor defendants to the plaintiff for the covenant not to sue should be deducted from the judgment against the defendant and in favor of the plaintiff in action #34705. The defendant contends, over the objection of plaintiff, that the $17,000 determined by the jury to be the value of the playing rights granted plaintiff by the distributor defendants in the covenant not to sue should also be deducted from the judgment against the defendant. The parties are in dispute as to how the deduction, whatever its amount, is to be made, plaintiff contending that the verdict should be trebled and then the deduction made, and defendant contending that the deduction should be made from the verdict and then the remainder trebled.

■ As to the first question as to what amount should be deducted, the Court is of the view that both the monetary settlement ($25,000) and the value of the playing rights ($17,000) should be deducted. As to how the deduction should be made, the Court is of the view that the deduction must be made after the trebling of the general verdict.

On the question of what should be deducted the plaintiff's position is that the right which was granted was merely a right which could have been granted by the Court by means of an injunction under its equity powers, and therefore could not be in issue on the question of money damages.

The defendant asserts that this intangible right was given along with the $25,000 as a "package deal" and was a thing of value which should be computed by the jury based upon the evidence before them, and then added to the $25,000 in determining the amount of the set-off.

■ The rule appears to be that whether tortfeasors be joint or independent, the injured party is entitled to no more than compensation for his injury; and that consideration received from one, for the release of any claim against him, operates to reduce pro tanto the amount recoverable from the other. See: Husky Refining Co. v. Barnes, (Cir. 9, 1941) 119 F.2d 715, and McPherson v. Amalgamated Sugar Co., (Cir. 9, 1959) 271 F.2d 809.

The rule also seems to be that anything of value received should be set off in addition to the cash settlement. See: Husky Refining Co. v. Barnes, supra. This intangible right, though unliquidated in amount, was capable of being evaluated, and when submitted to the jury via special interrogatory, the jury could find and did find and assess a value on this intangible right. The jury had sufficient evidence before it to substantiate its answer to the special interrogatory.

On the question of how the deduction should be made, exhaustive research by the parties and independent research by the Court reveals that there is a paucity

of case law in this area. The only case dealing with this question of treble damages and set off in the anti-trust field at the appellate level is Flintkote Company v. Lysfjord, (Cir. 9, 1957) 246 F.2d 368, cert. den., 355 U.S. 835, 78 S.Ct. 54, 2 L. Ed.2d 46. See also: Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co., (Cir. 9, 1960) 284 F.2d 1, 4; reversed on other grounds, 82 S.Ct. 1130.

In Flintkote, supra, although the Court of Appeals reversed the judgment of the District Court on other grounds, it held that the District Court opinion, found in 135 F.Supp. 672, properly trebled the actual damages and then deducted the amount which the plaintiffs had actually received.

In the District Court opinion in Flintkote, supra, the District Court said 135 F.Supp. at page 676:

> "It is true that the trebled portion of the judgment is punitive in nature and does not represent actual damages. Yet to hold that the plaintiffs are entitled to one dollar less than the full trebled damages of $150,000 would be a direct repudiation, or at least a contravention of the provisions of the statute under which this very cause was brought. The covenant not to sue may not be employed to shatter the clear intent of the statute. If the $20,000 sum were subtracted before trebling the verdict, the mature judgment, plus the partial settlement, could amount to an aggregate of no more than $110,000. This is only a fraction of the 'one satisfaction' to which the plaintiffs are entitled under the Act."

In holding that the District Judge properly handled this matter, the Court of Appeals said in 246 F.2d 368, 398:

> "The collective liability for the alleged conspiracy as found at this trial, was $150,000. If no error had been committed, this is the amount which plaintiffs should have received. The plaintiffs having already received $20,000, it was prop-

er to deduct that sum from the trebled amount. Any other method would have resulted in plaintiffs receiving less than the whole to which they were entitled."

It seems obvious from both opinions in the Flintkote case that the set-off is to be made against the judgment, and the judgment, of necessity, includes the treble damages.

The Court of Appeals made the foregoing proposition quite clear in the following language to be found at page 398 of the opinion in 246 F.2d:

> "The non-compensatory share of the award is akin to the award of exemplary or punitive damages. In the case of punitive damages joint tortfeasors are liable for the entire amount, not merely the compensatory part. Further, a niggardly construction of the treble damage provisions would do violence to the clear intent of Congress. The private antitrust action is an important and effective method of combatting unlawful and destructive business practices. The private suitor complements the Government in enforcing the antitrust laws. The treble damage provision was designed to foster and stimulate the interest of private persons in maintaining a free and competitive economy. Its efficacy should not be weakened by judicial construction.
>
> "Moreover, a contrary result would put a premium on litigation and discourage settlements. It is not the policy of the law to encourage litigation at the expense of compromise."

Defendant urges that the Flintkote case is not binding authority because the portion of the opinion dealing with the damage aspect is dictum. Defendant's contentions are not persuasive. The Court of Appeals spent two full pages on this issue of treble damages and set-off, and at the end of the opinion it said:

> "The judgment is reversed and the cause remanded for further pro-

ceedings not inconsistent with the views expressed in this opinion."

That portion of the Court of Appeals opinion dealing with treble damages and set-off is not dictum, and is binding upon this Court. Even if the Flintkote case is not binding on this point it is highly persuasive and should be followed.

A somewhat analogous field is found in cases dealing with violations of orders setting rental ceilings under Emergency Price Control. In these cases in which the courts awarded treble damages to the tenants of landlords who willfully disobeyed rental ceiling orders, there frequently arose the problem of set-off for the amount of rent due the landlord. These cases indicate that the actual damages should be trebled and that the amount of unpaid rent should be deducted. See: Waters v. Turner, D.C., 76 F. Supp. 279, and Sampson v. Thomas, D.C., 76 F.Supp. 691.

■ Along with Flintkote, supra, these cases indicate that where the law has a punitive purpose in multiplying the compensatory damages, such as in the anti-trust laws and the rent control laws, any set-offs, or deductions, from the judgment must be made after the compensatory damages are multiplied as required by law, so that the punitive purpose of the law will not be frustrated. The anti-trust law involved in this case, 15 U.S.C.A. § 15, states that the injured person "shall recover threefold the damages by him sustained." This Court is in accord with the holding in Flintkote, supra, that the purpose of these words will best be carried out by making the deductions after the general verdict has been trebled.

Therefore, in action #34705 the plaintiff is entitled to a judgment for $418,-500, plus costs and attorney's fees, being computed as follows,—the general verdict in the sum of $153,500 trebled equals $460,500, from which is to be deducted the sums of $25,000 (the amount previously paid plaintiff by the distributor defendants in consideration of the covenant not to sue) and $17,000 (the amount

determined by the jury to be the value of the playing rights in answer to the special interrogatory), or a total deduction of $42,000.00.

## II

### ATTORNEY'S FEES

■ In these actions the Court fixed the attorney's fees in action #34705 in the sum of $50,000, and in action #35663 in the sum of $5,000, a total attorney's fee of $55,000 in the consolidated actions. The defendant attacks these fees as being excessive, and since the question of attorney's fees in anti-trust actions is addressed to the sound discretion of the Court, the Court feels it should set forth the reasons for fixing the stated fees in the respective actions.

■ The Court used the following criteria in fixing the fees in these cases:

1. The nature of the questions involved, their novelty and difficulty, and the skill and competence of counsel required to properly conduct the cause;

2. The customary charges of the Bar for similar services;

3. The standing of counsel in the community; and

4. The amount recovered in the controversy and the beneficial result obtained by counsel.

### (1) Nature of the case

As has heretofore been noted there were two consolidated cases, the major case being action #34705 for violation of the anti-trust laws with relation to the general motion picture business as heretofore described, and action #35663, an anti-trust action involving only the cinemascope process and the parties connected therewith. These cases took five full weeks to try, and involved substantial pretrial and post-trial proceedings. The affidavits of counsel show that counsel for the plaintiff spent 2,300 hours of time in the preparation of the case. The cases involved several novel and difficult questions, among which were the evaluation of the playing rights granted plaintiff by the distributor defendants in the cov-

enant not to sue, the matter of making deductions from the judgment as the result of the covenant not to sue, and a most difficult and extensive problem in connection with the voir dire examination of a trial juror. In stating what the Court considers to be novel and difficult questions, the Court does not mean to exclude the other difficulties of trial in an anti-trust suit of this nature, in which the plaintiff had to make an extensive investigation in order to prepare the evidence to establish liability and prove damages. The Court is of the view that this case has turned out to be somewhat of a test case in this area as to this particular kind of motion picture anti-trust action, and it is the predecessor of a number of cases involving the same defendant. Therefore it has been bitterly contested, and for that reason the burden of the plaintiff has been made greater. In this situation the plaintiff required and received representation by counsel of unusual skill and competence.

### (2) Customary charges of the Bar for similar services

In this area of consideration not much evidence was offered by the parties. However reference has been made to a number of cases in other areas involving awards of attorney's fees in anti-trust cases, some of which were similar types of movie anti-trust cases. The Court has examined these cases and the Court finds that they vary considerably with the defense and the nature of the case. The Court feels that its awards of attorney's fees are within the general range of some of the many cases [3] which discuss attorney's fees in anti-trust actions, and without any further discussion the Court will pass on to the other criteria.

| 3. Case | Damages (trebled) | Fee award |
|---|---|---|
| Union Carbide and Carbon Corp. v. Nisley, Cir. 10, 1962, 300 F.2d 561, 587; reversed trial court on issue of damages, but approved 15% of amount recovered as attorney's fees | $4,400,000 | $500,000 |
| Sunkist Growers Inc. v. Winckler & Smith Citrus Prod. Co., Cir. 9, 1960, 284 F.2d 1, 4; (reversed on other grounds 82 S.Ct. 1130, No. 241 October Term decided May 28, 1962) | 1,447,500 | 195,000 |
| Clapper v. Original Tractor Cab Co., Cir. 7, 1959, 270 F.2d 616, 626 | 82,834.05 | 25,000 |
| Darden v. Besser, Cir. 6, 1958, 257 F.2d 285, 286; attorney's fee increased from $10,000 to $30,000 by Court of Appeals | 135,000 | 30,000 |
| Twentieth Century-Fox Film Corp. v. Brookside Th. Corp., Cir. 8, 1952, 194 F.2d 846, 858; the Court of Appeals reduced the attorney's fee from $150,000 to $100,000 | 1,025,000 | 100,000 |
| Milwaukee Towne Corp. v. Loews, Inc., Cir. 7, 1951, 190 F.2d 561, 569; the Court of Appeals reduced the attorney's fee from $225,000 to $75,000, and also reduced the award of treble damages from $1,295,878.26 to $941,574.30 | 941,574.30 | 75,000 |
| American Can Co. v. Bruce's Juices, Cir. 5, 1951, 187 F.2d 919, 920 | 180,000 | 35,000 |
| Noerr Motor Freight v. Eastern Railroad Pres. Conf., D.C.E.D.Penn., 1958, 166 F.Supp. 163, 168 | 652,074 | 200,000 |
| Webster Motor Car Co. v. Packard Motor Car Co., D.C.D.C., 1955, 166 F.Supp. 865, 866; the attorney's fee was fixed at 23% or 24% of single damages | | 45,000 |

### (3) Standing of counsel in the Community

In this respect the Court will note that chief counsel for plaintiff has a very high reputation not only in the community of San Francisco, but in the western part of the United States and the country as a whole, as an experienced, competent and outstanding plaintiff's anti-trust lawyer. The reported cases in which he has been involved are numerous and demonstrate his wide range of experience in this area of practice.

### (4) Results of the actions

In this area of the case counsel has produced a very satisfactory result for his client. In action #34705 the verdict of the jury was $153,500, after being trebled and after deductions, the judgment was $418,500. In action #35663 the verdict was for $6,800, and trebled it resulted in a judgment of $20,400. Not only were these substantial verdicts in amount, but they were substantially in accord with the claim of plaintiff as argued and presented by his counsel. The total amount of attorney's fees, $55,000, when compared to the total judgments, after deductions, $438,900, seems to be well within the range of fees allowed in other cases, being between twelve and thirteen percent of the judgment recovered, or approximately thirty-four per cent of the single damages awarded by the jury in both cases. (See footnote (3)) Considering all of the factors the Court is of the view that the attorney's fees awarded are not excessive, but are reasonable.

## III

## CLAIMED MISCONDUCT OF JUROR ON VOIR DIRE EXAMINATION

Defendant, United California, has moved for a new trial on the ground of misconduct of the jury. This ground is based on the claimed misconduct of juror George W. Parker, the foreman of the jury, because of his alleged failure to give certain information concerning his background in his answers to questions put to him collectively with other jurors on voir dire examination by the Court. At the examination the juror did not disclose that for more than two years prior to the examination he had been, and during the course of the trial he was going to be, a volunteer, unpaid teacher, or group discussion leader, of the Henry George School of Social Science, a non-profit California corporation, which, in turn, was chartered by a New York educational corporation bearing the same name. The question is, was he required to give this information in response to the questions propounded in the examination, and, if so, was his failure to give the information so "inherently prejudicial as a matter of law * * * to require the court * * * to set the verdict aside and grant a new trial." Frazier v. U. S., 1948, 335 U.S. 497, 513, 69 S.Ct. 201, 210, 93 L.Ed. 187; Cavness v. U. S., Cir. 9, 1951, 187 F.2d 719, 723.

Since this motion is addressed to the sound discretion of the Court (Mattox v. U. S., 146 U.S. 140, 146, 13 S.Ct. 50, 36 L.Ed. 917, 6 Moore's Federal Practice, 2nd Ed. 3802), this portion of the memorandum will be addressed mainly to the reasons for the exercise of the Court's discretion, and not to a compilation of the many judicial and other writings on the subject of jury misconduct on voir dire examination.

Mr. Parker was summoned as a prospective juror in this civil anti-trust action involving claims of conspiracy to restrain trade and monopolization in the motion picture exhibition business. The plaintiff was a single theater corporation and the defendant was a corporation operating in excess of one hundred theatres, and the alleged co-conspirators (sued originally as defendants, but dismissed from the action as defendants before trial as the result of settlements with plaintiff) were distributors of motion pictures. It was in this setting that

the Court conducted its voir dire examination under Rule 18 of the Rules of Practice of the United States District Court for the Northern District of California, West's Ann.Code, which states:

"Examination of prospective jurors shall be by the Court alone. If counsel for any party desires that additional matter be inquired into, he shall state the matter to the Court, and if the matter is proper, the Court shall conduct the examination."

The questioning by the Court was mainly collective, but was also individual in a few cases. After the panel was sworn the box was filled with twelve prospective jurors, and the Court briefly explained the nature of the action.[4]

Juror Parker gave his name, residence address, and the nature and place of his employment. (Comptroller for frozen food distributors in Oakland, California. Rep. tr. pp. 3–4). The Court then explained that the purpose of the questioning was to determine the qualifications of the jurors to sit in the case.[5] Then followed questions concerning prior experience with antitrust actions, either individually or through employment (Rep. tr. pp. 21–25); opinions and prejudices concerning antitrust laws;[6] the re-

4. "The Court: I think I should explain the nature of the action to you briefly so that you will understand the nature of the case to the extent that you will be able to answer questions which will be put to you as to your qualifications as jurors in this case. This is what is known as antitrust action * * * the allegation is that the defendants conspired to violate the particular antitrust laws involved here. And in the second cause of action there is the allegation, also, that the defendant * * by its conduct monopolized the motion picture business in the particular area and also conspired to monopolize with others to monopolize the business there." (Rep. tr. pp. 2–3)

5. "The Court: First of all, ladies and gentlemen, I am going to ask you some collective questions. I want you at any time during the questioning to feel free to interrupt the questioning or to stop the questioning if you have any question to ask or any statement to make. The only way that I can ascertain your frame of mind and the only way I can determine whether you are qualified to sit as jurors in this case is to have from you a full and frank statement on any issue which is presented to you. The purpose of this questioning is to attempt to ascertain your qualifications to sit as jurors and the questioning will go into such subject matters or areas as your knowledge concerning the particular suit, your acquaintanceship with any of the officers, agents or directors of the corporations involved, your connection, if any, with the motion picture exhibiting field or the distributing or producing field, your opinions concerning antitrust laws and things of that sort, so the questions will be directed to these areas. I want to assure you that although they may go into some of your personal opinions and cover some of your personal activities, they are not intended in any way to embarrass you; but the questions, to the extent that they do go into your personal lives, will only do so to enable the Court to determine whether or not you have any knowledge, acquaintance or any fixed opinions or conclusions which would affect your ability to be fair and impartial as jurors in this case. And so, therefore, I am going to start questioning collectively and, if at any time it becomes necessary, I will ask specific questions to individual jurors." Rep. tr. pp. 10–11)

6. " * * * Now, do any of you have any prejudice either one way or the other in the enforcement of the antitrust laws? In other words, I put it deliberately that way so that you can indicate to me if you have a prejudice in the field.

"Now I will go further into it. When I say 'prejudice' I mean it is a fixed idea or a notion about the law which will make it unable for you to be fair and impartial in passing on the evidence which would be produced in this case to attempt to show some violation of the antitrust laws. Do any of you have fixed opinion or notion or ideas in that area? (No response) (Rep. tr. p. 25)

"Now, then, do any of you have any feelings that the antitrust laws are unfair and unwise and, in other words, that they should not be the law? Do any of you have any feelings of that kind? (No response) (Rep. tr. p. 25)

"On the other hand, do any of you feel that the antitrust laws as we now have them are not sufficiently strong and that they are not sufficient to allow either the Government or private persons to seek redress, if there has been an unlawful restraint of trade? Do any of you

lationship between a small business organization and a relatively large business organization; the relationship of the free enterprise system and socialism, and any prejudices that might flow therefrom;[7] and the willingness of the jurors to follow the Court's instructions on the anti-trust laws.[8] In answer to these and other questions the juror did not disclose his relationship to the Henry George School of Social Science. Counsel were given the opportunity to propose additional questions through the Court. None were proposed.

Prior to the trial and in preparation for the voir dire examination defendant had the benefit of a report of a jury reporting service concerning Parker and other prospective jurors. The report (see report attached to Exhibit 3, the affidavit of Marshall Naify) gave the name, address, occupation, place of occupation, age, marriage status, name of wife, quality of home neighborhood, approximate value of home, political party registration of himself and wife, and report of prior jury experience. (In this report Parker had had prior jury service in two F.E.L.A. cases, being foreman of the later case). Defendant asserts that after the verdict, and on further investigation defendant discovered the relationship of Parker to the Henry George School of Social Science, and made the motion for a new trial. On this aspect of the motion the Court heard and received evidence both oral and documentary. In pre-hearing proceedings and at the hearing the Court followed the policy of limiting the inquiry to the alleged misconduct of Parker in his answers to the questions on voir dire examination, and prohibiting and foreclosing any examination into the jury deliberations. Full inquiry was permitted into Parker's background, understanding, knowl-

---

have any feelings of that kind? (No response) (Rep. tr. p. 26)

"Do all of you feel that since the anti-trust laws are the laws of the United States that they should be fairly and impartially enforced? Is there any question in any of your minds on that? (No response) (Rep. tr. p. 26)

"All right, I take it that all of you feel that these laws should be enforced." (Rep. tr. pp. 24–26)

7. "The Court: Now, then, coming to the parties here * * * Now, both of the parties here are corporations ∗ ∗ ∗ but in terms of the general business world, the plaintiff is a relatively small corporation operating a single theatre, where the defendant is a relatively large corporation operating a number of theatres * * * but as between the two there is, from the standpoint of the financial resources of either enterprise, that one is larger than the other.

"∗ * * Can you be just as fair to the large corporation as you can to the small corporation, and vice versa? * *

"And, now, there is one other field that has been suggested and that is: Do any of you have any ideas or beliefs which are opposed to the free enterprise system as compared to a socialistic system where there is the state ownership or complete state regulation: Do any of you have any quarrel with the free enterprise system? (No response) (Rep. tr. p. 28)

"I take it none of you do. Then do any of you have any feelings about competition, that is, feelings, without anything else, that would create any feelings in your mind against a business entity which is either made up of a partnership, corporation or some other type of joint venture as against a single person? Do any of you, without hearing further, have a prejudice against a larger corporation and in favor of the individual. Can you at this point honestly say in your own minds that there is nothing in that type of relationship which would in any way influence you one way or the other and that you have to hear evidence before you determine the rights, duties and liabilities of the respective parties; is that correct?" (No response received) (Rep. tr. p. 29)

8. "Now, since this involves the antitrust field and viewing your present frame of mind as it now stands, are all of you willing to accept the instructions of the Court as to what the law is, as it is applied to this case, when the instructions are given and will you attempt to follow those instructions? In other words, to put it in the reverse, do any of you now have ideas, notions or beliefs about what the law is or what the law ought to be so that you could not set those aside and follow the instructions of the Court? I take it that none of you have any feelings of that kind." (Rep. tr. p. 27) .

edge and information concerning the case, his Henry George School connection, and his philosophical and educational beliefs in relation thereto, but no inquiry was permitted to Parker or his fellow jurors on what occurred in the jury room. In this respect the Court took into account the policy considerations disclosed in Primm v. Continental Casualty Co., D.C., W.D.La., 1956, 143 F.Supp. 123, at 126 and 127, and Lay v. J. M. McDonald Co., D.C.Colo., 1959, 24 F.R.D. 36, 40. The Court was mindful, also, of the teachings in the cases prohibiting impeachment of verdicts by jurors. See: McDonald v. Pless, 238 U. S. 264, 35 S.Ct. 783, 59 L.Ed. 1300, and Northern Pacific Railway Co. v. Mely, Cir. 9, 1954, 219 F.2d 199, 201. In the latter case the court said:

"We do hold for future guidance that it is improper and unethical for lawyers, court attaches or judges in a particular case to make public the transactions in the jury room or to interview jurors to discover what was the course of deliberation of a trial jury." (219 F.2d 202)

From the evidence before the Court at both the voir dire examination and the post trial hearing, it is clear that at the time of the voir dire examination Parker had a connection or relationship with the Henry George School of Social Science in Northern California, and that this fact was not disclosed during the examination. This nondisclosure, says defendant, is prejudicial because an instructor in the philosophy and teachings of Henry George could not be a competent juror in an antitrust action, and, in any event, it precluded defendant from information necessary to the intelligent exercise of peremptory challenges. Plaintiff counters that there was no misconduct because the void dire questions were not sufficiently clear and direct to require an answer giving the undisclosed information, and, in any event, the failure to disclose was not prejudicial because a disclosure would not have disqualified the juror, and, further, that there was no intentional misstatement or wilful nondisclosure of a material matter showing bias, prejudice or hostility against any of the parties; and, finally, that defendant could have discovered the alleged disqualification by due diligence prior to the trial.

Essential to defendant's position is that there was some materially false or evasive answer by the juror. If the questions asked did not sufficiently inquire into the subject matter to be disclosed by the juror so as to put a reasonable person on notice that an answer was required, then there can be no misconduct in a failure to make an answer or statement. This is so even though relevant and pertinent information concerning the juror is not made available to the court and counsel, and even though it would have been preferable to have the information available. Voir dire examination is not a game in which the questioner is engaged in a battle of wits with the prospective jurors. It is a time honored process by which courts determine the qualifications of jurors to fairly and impartially try the issues to be presented to them. It treats with a frame of mind, and, therefore, cannot be circumscribed by any technical conception. It always must be interpreted in the light of realities of the setting in which it occurs. Jurors can be required only to honestly and conscientiously answer the real implications of the questions asked, no more and no less. And, while the sweep of the questions may be general and broad, the affirmative duty of the prospective juror is to answer as fully and completely as possible under the circumstances.

In the light of these principles did the juror, Parker, give false or evasive answers to voir dire questions by his nondisclosure of his connection with the Henry George School and his studies of the philosophy and teachings of Henry George? His testimony at the hearing negates any such implication. He had been a juror twice before in personal injury (F.E.L.A.) cases, and had not disclosed such information on voir dire examination (Rep. tr. pp. 127–128); he

was not compensated for his services as discussion leader of the Henry George School, nor was he an officer of the Society which operated the school (Rep. tr. pp. 128–130); he was a graduate of the Stanford University Graduate School of Business Administration (Rep. tr. p. 159); he may have mentioned the antitrust laws in leading discussions and as a student in the Henry George School, but such antitrust laws were not the subject of instruction as regarding business, or their relationship to the philosophy of Henry George (Rep. tr. pp. 153–154); and he believed in the enforcement of the antitrust laws, and did not believe in socialism. (Rep. tr. pp. 154–155). In respect to his discussion of some of the Henry George principles he testified:

"Mr. Bourquin: Q. As it is termed in the book, the remedy. Did you teach that by adoption of the remedy society would thus approach the promised land of Herbert Spencer and the abolition of government?

"A. No.

"Q. Did you teach your classes that by adoption of the proposals of Henry George society would reach the ideal of the socialist, not through government repression; government would change its character and become the administration of a great cooperative society which would become merely the agency by which common property was administered for the common benefit? Did you teach that?

"A. I didn't teach it. The students were exposed to it. I suggested they could believe it or not believe it. Those would be the ultimate possibilities. I expressed doubt in my mind that any application of this theory would give that degree of benefit.

"Q. Did you teach your classes that by adoption of the Henry George proposals society would then become able to establish public baths, museums, libraries, gardens,

lecture rooms, music dance halls and theatres?

"A. The same answer as the last time." (Rep. tr. pp. 166–167). With respect to his intentions on voir dire examination he said:

"Mr. Alioto: Q. * * * Now, then, at any time in that voir dire examination, Mr. Parker, did you intend to deceive this Court?

"A. I did not.

"Q. Did you intend deliberately to conceal the fact that you had a leisure-time activity for which you were not paid in relation to the Henry George School?

"A. I did not.

"Mr. Alioto: We have no further questions.

"The Court: Along this line, Mr. Parker, what was your understanding of your connection with the Henry George School as it related to the questioning asked by the Court? (on voir dire examination)

"The Witness: *As a matter of fact, Your Honor, the thought never occurred to me that there was a relationship. I never even thought of that while I was sitting there.* (emphasis added)

"The Court: And the questioning of the Court in connection with your qualifications asking into your views insofar as the philosophic or the social views behind the antitrust laws and the business relationships never in any way bore any relationship to your activities in connection with discussion groups in the Henry George School?

"The Witness: In no way at all." (Rep. tr. pp. 155–156)

█ From this testimony it is apparent that Parker never equated his Henry George School connection with the basic purpose of government behind the antitrust laws, namely, to outlaw monopolies and combinations in restraint of trade. In this respect the Court finds Parker to be a credible witness. His

demeanor on the stand and his conduct throughout the trial was conscientious, respectful and attentive. He answered questions with candor and without evasiveness. He was not argumentative or assertive, and he appeared to have good powers of comprehension. In short, his testimony is believed by the Court. Therefore, the Court finds that he did not evasively answer or fail to fully answer the questions put to him on voir dire examination, and that under the voir dire questions he was under no duty to disclose his Henry George School connection. This is true because the voir dire questions were concerned with the opinions, views and experiences of the prospective jurors about and with the antitrust laws and the basic purpose of those laws to maintain a competitive, free enterprise system in the United States, while his connection with the Henry George School was to discuss and explain, not to follow, the economic principles of Henry George,[9] which were not related in any material way to the application of the antitrust laws to modern business relationships in the United States today. To hold that a prospective juror must, under the pain of misconduct, disclose every economic, social or political principle he ever studied, considered or expounded upon when asked about his knowledge and beliefs about antitrust laws would create a snare and a trap for most any citizen who had the unfortunate experience of being summoned as a prospective juror in such a case in a United States District Court, and would create havoc in the administration of the jury system in this type of case, which is already fraught with complex and difficult problems of jury presentation.

The cases dealing with the problem are somewhat conflicting, but seem to indicate that each case turns on its own particular facts, and in this respect may be reconcilable. However, as could be expected, it is difficult to delineate any clear cut distinctions, particularly in the border line cases. There are a number of cases cited by defendant holding that nondisclosure was so prejudicial as to require a new trial. Defendant places great reliance upon Consolidated Gas and Equipment Co. of America v. Carver, Cir. 10, 1958, 257 F.2d 111; U. S. v. McCorkle, Cir. 3, 1957, 248 F.2d 1; U. S. v. Chapman, Cir. 10, 1946, 158 F.2d 417; U. S. v. Lampkin, D.C., S.D.Fla., 1946, 66 F.Supp. 821; and Marvin's Credit Inc. v. Steward, 1957, 133 A.2d 473. See also: U. S. v. Cavell, Cir. 3, 1961, 287 F.2d 792. In all of these cases, except Chapman and Lampkin, supra, a new tri-

---

9. The principles of Henry George are described in Vol. 10 of the Encyclopedia Britannica, 14th Ed., p. 192, as follows: "The land of every country belongs of right to all the people of that country. This right cannot be alienated by one generation, so as to affect the title of the next, any more than men can sell their yet unborn children for slaves. Private ownership of land has no more foundation in morality or reason than private ownership of air or sunlight. But the private occupancy and use of land are right and indispensable. Any attempt to divide land into equal shares is impossible and undesirable. Land should be, and practically is now, divided for private use in parcels among those who will pay the highest price for the use of each parcel. This price is now paid to some persons annually, and it is called *rent*. By applying rent of land, exclusive of all improvements, to the equal benefit of the whole community, absolute justice would be done to all. As rent is always more than sufficient to defray all necessary expenses of government, those expenses should be met by a tax upon rent alone, to be brought about by the gradual abolition of all other taxes. Landlords should be left in undisturbed possession and nominal ownership of the land, with a sufficient margin over the tax to induce them to collect their rents and pay the tax. They would thus be transformed into mere land agents. Obviously this would involve absolute free trade, since all taxes on imports, manufactures, successions, documents, personal property, buildings or improvements would disappear. Nothing made by man would be taxed at all. The right of private property in all things made by man would thus be absolute, for the owner of such things could not be divested of his property, without full compensation, even under the pretence of taxation."

al was granted because of jury misconduct resulting from nondisclosure of a material fact by a juror on voir dire examination. In Consolidated Gas, supra, the juror in a personal injury action failed to disclose that at the time of the examination he was a plaintiff in a personal injury action in another court for personal injuries received within two years of his jury service; in McCorkle, supra, the juror failed to disclose the fact that he had been the victim of a robbery in the same area and within seven months of the robbery involved in the trial upon which he was sitting; in Cavell, supra, a murder case juror was a son-in-law of the Chief County Detective, one of the main prosecution witnesses, which fact was not discovered until the time to exercise challenges had passed; and in Marvin's Credit, supra, the juror, in an action to recover for merchandise sold, failed to disclose that she had ever had a charge account at the plaintiff's store, or that she had ever been sued on a charge account by plaintiff's store. In Chapman, supra, the court, after exhaustion of peremptory challenges, overruled a challenge for cause to a juror who had served recently as an adverse expert witness in a similar action against the challenging party, and was friendly to the opposing party. In Lampkin, supra, a juror in a criminal case was held in contempt for failure to disclose that he had previously been convicted of a crime. In all of these cases, except Chapman, supra, there was a failure to give material information directly solicited by the voir dire questions. In each case the court considered the giving of the information sought so vital to a fair trial that the nondisclosure made the juror incompetent, and required the granting of a new trial. On the other hand, plaintiff cites many cases where nondisclosure did not require a new trial. In Fritz v. Boland & Cornelius, Cir. 2, 1961, 287 F.2d 84, where a juror in a personal injury case (Jones Act) did not disclose his own prior personal injuries because he was not asked about them, there was no misconduct.

Consolidated Gas and Equipment Co. of America v. Carver, supra, was distinguished on the ground that the Carver case should only "govern situations where a prospective juror has either lied or failed to give a truthful answer on voir dire, or in some way concealed a known disqualification." (287 F.2d 86). In U. S. v. Eury, Cir. 2, 1959, 268 F.2d 517, 521, a criminal case involving a contractor, where a juror said on voir dire that she had never been involved in any business dealings with any builder, or contractor, and that there was nothing in her experience which would cause her to be prejudicial against a builder, or contractor, yet she, with her husband, had been involved with a contractor, her brother-in-law, and had lost money thereby. Similar to juror Parker in the case at bar, her involvement with a contractor did not "enter her mind" at the time of the voir dire examination. In holding the juror's nondisclosure was not grounds for a new trial the court relied on Cavness, supra and infra. In Deschenes v. U. S., Cir. 10, 1955, 224 F.2d 688, 690, a mail fraud criminal case, where, in response to a question asking if any of the prospective jurors were, or had been police officers, a juror failed to disclose that he was a member of the Wichita, Kansas, Crime Commission. The trial court did not consider that being a member of a Crime Commission made the juror a police officer, and the Court of Appeals would not infer it, citing Cavness, supra and infra, and Frazier, supra. In Cavness v. U. S., Cir. 9, 1951, 187 F.2d 719, 722, a narcotics criminal case, where one juror, a reserve officer in the Honolulu Police Department, did not respond when the jury panel was asked as a whole if any of them were or had been reserve police officers. The court held that membership in a police force was not a disqualification for jury service and that no actual bias and prejudice on the part of the juror was shown, and none would be presumed from the mere fact of being a police officer. And in Baker v. Hudspeth, Cir. 10, 1942, 129 F.2d 779, 783, a mail fraud criminal case

where a prospective juror answered a question concerning his occupation by saying he was a farmer and merchant, but failed to disclose that he was also an Assistant Postmaster, the court held the nondisclosure not to be misconduct, because the Assistant Postmaster office was only incidental to his occupation as a farmer and merchant, and there was no intent to deceive because he was a farmer and merchant. In this respect Parker's position here is stronger than that of juror Goggins in the Baker case, because Parker's connection with the Henry George School was a voluntary, nonpaid, occasional activity in no way connected with his regular occupation as comptroller for a frozen food company, and, further, the position of Goggins as an Assistant Postmaster in relation to being a juror in a criminal mail fraud case would seem to be more susceptible to prejudice than Parker's position as a discussion leader in the Henry George School in relation to being a juror in a civil, private antitrust action. See also: Stanczak v. Pennsylvania R. Co., Cir. 7, 1949, 174 F.2d 43. In addition to those cases cited by plaintiff is the case of Lay v. J. M. McDonald Company, D.C., Colo., 1959, 24 F.R.D. 36, 37, in which a prospective juror was asked if she had ever been involved in any type of accident resulting in injury to her head which caused permanent disability, to which she responded in the negative and failed to disclose that nineteen years prior to the trial she had fallen off a cliff and injured her head. The Carver case, supra, was distinguished on the ground that the prior injury in Lay was remote, and since there was no showing that it caused permanent disability the negative answer was not deceptive, and the nondisclosure was not misconduct for which a new trial should be granted.

The conduct of Parker here appears to be less prejudicial than that which was held to be non-prejudicial in the cases cited by plaintiff, and his failure to disclose was under the circumstances and questions far less demanding than those cases. The information not disclosed would not have disqualified him to act as a juror. There was no deception or misleading on any material point. Therefore, the motion for a new trial on the ground of the claimed misconduct of the juror, George W. Parker, must be denied.

The order denying the motion for a new trial has heretofore been entered.