MISSOURI PORTLAND CEMENT COMPANY, Plaintiff v. UNITED CEMENT, LIME, GYPSUM AND ALLIED WORKERS INTERNATIONAL UNION, DIVISION OF BOILERMAKERS, AFL-CIO, LOCAL No. 438 *et al.*, Defendants (Missouri Portland Cement Company, Petitioner-Appellant; Carl Medley, Respondent-Appellee).

Fifth District   No. 5—85—0209

Opinion filed July 21, 1986.—Rehearing denied September 5, 1986.

HARRISON, J., dissenting.

Joseph J. Neely, of Neely &Neely, of Metropolis, and·Michael S. Mitchell, of McGlinchey, Stafford, Mintz, Cellini & Lang, of New Orleans, Louisiana, for appellant.

Paul F. Henry, of Kruger & Henry, of Metropolis, for appellee.

JUSTICE WELCH delivered the opinion of the court:

The plaintiff, Missouri Portland Cement Company, appeals from a bench trial in which the trial court entered a verdict and judgment for defendant Carl Medley finding him not guilty of indirect civil contempt. On appeal, the plaintiff raises the issue of whether the trial court's refusal to admit into evidence a videotape recording constituted an abuse of discretion prejudicial to the plaintiff. We reverse and remand.

On July 27, 1984, the circuit court of Massac County entered a reciprocal permanent injunction enjoining the defendants United Cement, Lime, Gypsum and Allied Workers International Union, AFL-CIO, Local No. 438, its officers, members, and all persons acting in concert with them, from:

> "A. Threatening, intimidating, molesting, restraining, coercing, harassing, or in any other way interfering with Missouri Portland Cement Company, its realty and personal property, its employees, agents, suppliers, customers, business invitees, guards, their property and their family members, and all other persons attempting to enter, leave, or otherwise on the property of Missouri Portland Cement Company and those persons' property and their family members;

\* \* \*

. J. In any way creating an obstruction to the free flow of traffic in both directions on the county road leading to the company or any other public roads leading to the company; \*\*\*."

In its order the court further stated:

"2. That the plaintiff shall post a copy of this Order at its main gate, which posting shall constitute good and sufficient actual notice to any other persons acting in concert with the parties who shall appear at plaintiff's main gate; \*\*\*."

Following the order of the trial court, defendant Carl Medley was personally served a certified copy of the temporary restraining order. In addition, a certified copy of the reciprocal permanent injunction was served on the officers of the defendant Union, giving constructive notice to defendant Medley. Also, a certified copy of the reciprocal permanent injunction was posted at the front gate of plaintiff's plant located near Joppa, also giving "good and sufficient actual" notice to defendant Medley as prescribed in the court's order.

Following the order, on August 23, 1984, an incident occurred on Highway 45, a road leading to and from the plaintiff's plant, during which allegedly defendant Medley threw a brick through the windshield of a Pro-Sec van driven by its employee, Frank Benton, accompanied by Andrew Chambers, another employee of Pro-Sec. Their job included delivering food into the plaintiff's plant. At that time, the defendant Union still continued to picket the plaintiff's plant. In response to the incident, the plaintiff filed, on November 16, 1984, a sixth petition for order to show cause why defendant Medley should not be held in contempt of court for his failure to comply with the terms of the reciprocal permanent injunction. On November 16, 1984, the trial court entered an order finding "that an Order to Show Cause should be entered as to why Carl Medley should not be held in contempt of court for his failure to comply with the terms of the reciprocal permanent injunction. On November 16, 1984, the trial court entered an order finding "that an Order to Show Cause should be entered as to why Carl Medley should not be held in contempt, and punished therefore, by reason of his failure and refusal to comply with and abide by the Reciprocal Permanent Injunction entered by the Court in this cause \*\*\*."

On March, 1, 1985, a bench trial was held regarding the indirect-civil-contempt charge against defendant Medley. At the bench trial, the following evidence was adduced. Andrew Chambers, the passenger of the van owned by Pro-Sec stated that after he left the plant, he proceeded to Joppa via Highway 45. After driving on the highway

for several minutes, Chambers stated that a white pickup truck approached the van in the opposite direction. As the pickup truck approached, the driver of the truck threw a brick into the van's windshield causing not only scratches and cuts to its occupants but also $286 in damage to the van. Immediately after the incident, the driver and Chambers reported the incident to state trooper Sergeant Wetherington.

Traveling behind the van were Gordon and Kana Smith, who observed the incident. They described the pickup truck as an early 1970 model white Ford pickup with its tailgate either missing or down. Kana Smith gave a description of the driver as a white male, mid-thirties, muscular build wearing a white tee shirt and green and white ball cap. She also stated that the driver had a moustache.

After receiving a description of the pickup and its driver, Sergeant Wetherington drove to the plaintiff's plant to investigate. Upon arrival, he observed a white pickup truck matching the description he was given. When he asked who the owner was, defendant Medley identified the truck as his. Defendant Medley's clothing and physical appearance also matched the description given by Kana Smith. However, the defendant Medley stated that he had been at the picket line since approximately 6 p.m. that evening.

At the contempt hearing, defendant Medley continued to deny throwing the brick or being anywhere in the vicinity of the incident. In order to rebut defendant Medley's alibi and attack his credibility, the plaintiff attempted to admit into evidence a videotape. The plaintiff's videotape depicted the plant at the time between 6:22 and 7:25 p.m. on August 23, 1984. The plaintiffs proffered that the videotape would reveal, contrary to defendant Medley's and his witnesses' testimony, that he and his pickup truck were not present at the front gate of the plant at 6:22 p.m. and at 6:44 p.m. and that his first appearance at the front gate in the videotape was at 7:25 p.m.

The court allowed testimony regarding the videotape but reserved ruling on its admissibility until at the end. During that time, the plaintiff presented several witnesses to lay a foundation for admitting the videotape.

Chambers was able to positively identify a segment of the videotape at 6:44 p.m. which showed him leaving the gate in the van. Sergeant Wetherington was able to identify a segment of the videotape at 7:25 p.m. Mel Brekhus, plaintiff's plant manager, described the procedure used in videotaping. He also stated that the videotaping was regularly done pursuant to his instructions. He also explained how the programmable timer records both the time and date on the

videotape as it is filmed. The programmable timer is always on whenever filming is done. Additionally, he stated that the cameraman periodically during taping describes the scene he is taping and speaks the day, date and time into the camera's microphone. He also stated that he recognized the voice in this videotape as that of Jim Davis, an experienced cameraman. Jim Davis was not produced at trial because he was beyond the subpoena power of the court. Brekhus also stated that the camera was in good working condition on the day in question.

After the plaintiff presented the foregoing testimony the court ruled that the videotape was inadmissible. In doing so, the court stated that a "foundation is properly laid if it were proper rebuttal evidence, but I find nothing there that it rebuts." Thus, the court found that the plaintiff failed to prove by a preponderance of the evidence that the defendant was guilty of indirect civil contempt. From the court's verdict the plaintiff appeals.

■■■ Illinois courts have established that motion pictures are considered admissible on the same basis as photographs and as such the principal question being of relevancy. (*Department of Public Works & Buildings v. Oberlaender* (1968), 92 Ill. App. 2d 174, 190, 235 N.E.2d 3, 12, *aff'd* (1969), 42 Ill. 2d 410, 247 N.E.2d 888.) Further, the admission of photographs or videotape is within the discretion of the trial court, and will not be reversed absent an abuse of discretion. (*Pace v. McClow* (1983), 119 Ill. App. 3d 419, 427, 458 N.E.2d 4, 10.) In line with the court's rule in *Pace*, a videotape can be admitted into evidence if it is identified by a witness as a portrayal of certain facts relevant to a particular issue and is verified by that witness with personal knowledge as a correct representation of these facts. Verification may be furnished by the testimony of any competent witness who has sufficient knowledge to testify that the videotape fully represents what it purports to portray. (See *City of Chicago v. Scandia Books, Inc.* (1981), 102 Ill. App. 3d 292, 299, 430 N.E.2d 14, 19.) Thus, the testimony of the photographer or cameraman is not necessary. (*Casson v. Nash* (1977), 54 Ill. App. 3d 783, 370 N.E.2d 564, *aff'd in part, rev'd on other grounds* (1978), 74 Ill. 2d 164, 384 N.E.2d 365.) Under Casson, "[p]hotographs, when relevant and properly authenticated, are admissible for two distinct purposes: (1) to illustrate the testimony of a certain witness [citations]; and (2) to act as probative or real evidence of what the photograph depicts." 54 Ill. App. 3d 783, 795, 370 N.E.2d 564, 573.

In view of the cited cases, this court must determine whether or not the trial court abused its discretion. In doing so, this court must look at the following factors: (1) whether a competent witness identi-

fied the portrayal of certain facts relevant to the particular issue; (2) whether the witness verified the videotape with personal knowledge as a correct representation of these facts; and (3) what the purpose of the videotape recording was to serve.

First, the court must determine whether the plaintiff presented a competent witness or witnesses to identify the videotape as portraying certain facts relevant to a particular issue.

Chambers stated that he normally leaves the plant around 6 or 6:30 p.m. From that statement, the plaintiff showed the videotape segment of the plant showing Chambers leaving the plant at 6:44 p.m. on August 23, 1984. In light of his work habits he was able to positively identify the segment. After Sergeant Wetherington stated his investigation on August 23 at the plant, he identified a segment of the videotape which showed himself and defendant Medley leaving the company at 7:25 p.m. on August 23, 1984.

Mel Brekhus, plant manager for the plaintiff, stated that the videotaping is done regularly and is conducted by the security personnel pursuant to his instructions. He stated that he instructed security to film all activities at the gate, tent and picket house. After filming the area, the supervisor of the security group brings the tapes to him. The tapes are then kept in his office. He explained that the date and time of the videotape is superimposed at the time it is filming. The cameraman will periodically describe the scene he is taping and speak the day, date, and time into the camera's microphone. He further stated that on the date in question Jim Davis operated the camera because he recognized his voice on the video. He also stated that Jim Davis was an experienced cameraman and that the camera was in good working condition that day.

Thus, the record reveals that the plaintiff presented competent witnesses to identify the videotape segments as well as the procedure employed taping and the procedure used to assure accuracy of the videotape. Also, the condition of the camera and the experience of the cameraman were verified. Furthermore, the plaintiff was not required to produce Jim Davis, the operator of the camera, under the rule to admit a videotape recording, especially since he was beyond the subpoena powers of the court. The plaintiff offered the next available source of information and competent witnesses. Thus, this court finds that the plaintiff did produce competent witnesses.

Next, this court must determine whether the witness verified the tape on personal knowledge as a correct representation of these facts. Chambers stated that he makes two runs a day to the plant, one in the morning between 8 and 9 a.m. and later between 5 and 6:30 p.m.

He could not state positively what time he left the plant on the date in question. However, he did state that the scene depicted at 6:44 p.m. on the tape was a correct representation of his leaving the plant in the van. Sergeant Wetherington stated that the videotape did correctly depict the scene at 7:25 p.m. on August 23, 1984. Sergeant Wetherington's testimony is based on his personal knowledge of the investigation he conducted. Whereas Chamber's testimony is based upon his work habits and work schedule, as well as his recognition of the van and the scene depicted. Further, Chambers' personal knowledge of the time in question is directly tied to the estimated time of the incident, which he stated happened between the time he left the plant and 7:30 p.m. As such, any lack of personal knowledge by Chambers of the specific date and time in question in the videotape does not affect the admissibility of the videotape but rather goes to the weight to be given Chambers' testimony. Thus, the plaintiff did present witnesses who to the best of their personal knowledge could verify the videotape scenes as a correct representation of the facts in question.

■■ ■ In the third and final consideration, this court must consider what purpose the videotape recording was to serve. The videotape was not only to illustrate testimony but also to rebut defendant Medley's alibi that he was at the picket line during the time of the incident. However, the court excluded the evidence stating that Davis, the operator of the camera, should have been called and that the specific segments did not rebut any testimony. This court finds that the trial court abused its discretion.

First, Davis was not a necessary witness. Furthermore, he was not called to the stand not because the plaintiff did not want to but because Davis was beyond the subpoena power of the court. Second, the videotape segment which Chambers viewed and verified did reveal that defendant Medley was not present at the picket line. Thus, it would go to rebutting defendant Medley's alibi. If nothing else, it did affect defendant Medley's credibility and the weight to be given his testimony. Third, the rule in admitting videotape does not rely on the rule that the videotape must rebut something at the trial. All that is necessary to admit the photograph is a competent witness who verifies the videotape as correctly representing the relevant facts and who verifies the videotape with his personal knowledge. Also, the videotape's purpose must be relevant to the proceedings. In this case, the plaintiff properly laid a foundation to admit into evidence a videotape relevant to the facts at issue. Thus, the trial court abused its discretion when it refused to admit the videotape into evidence.

For the foregoing reasons, the judgment of the circuit court of Massac County is reversed and the cause remanded with further proceedings consistent with this opinion.

Reversed and remanded.

KASSERMAN, P.J., concurs.

JUSTICE HARRISON, dissenting:
I respectfully dissent.
The trial court properly refused to admit the videotape into evidence. The majority acknowledges that the videotape would be admissible if a witness identifies it as an accurate representation of the events which it purports to portray. (See *Pace v. McClow* (1983), 119 Ill. App. 3d 419, 427, 458 N.E.2d 4, 10.) Plaintiff has failed to meet this foundational requirement.

The majority states that Andrew Chambers "was able to positively identify a segment of the videotape at 6:44 p.m. which showed him leaving the gate in the van." This is incorrect. Chambers simply stated that he normally leaves the plant around 6 or 6:30 p.m. every day, and that the tape showed him leaving the plant. He had no personal knowledge as to the time or date of the events shown on the tape, but stated the only way he knew the time and date of the events depicted was from the graphics superimposed on the videotape.

The majority is correct when it states that Sergeant Wetherington was able to identify a segment of the videotape as accurately portraying what occurred at 7:25 p.m. However, plaintiff was attempting to use the videotape to show defendant's truck was not at the plant at 6:22 p.m. or 6:44 p.m. There was no testimony that the videotape accurately portrayed the events which occurred at those times. Furthermore, there was no evidence the videotape was running constantly that evening, or was continually recording pictures of the area where defendant's truck was allegedly located. While plant manager Brekhus testified that a timer records the time and date on the videotape, he did not know how this was done and did not testify regarding the accuracy of the timing device.

Having reviewed all the evidence, I must conclude plaintiff failed to show by competent evidence that the videotape is an accurate representation of the events which it purports to portray.

Plaintiff also argues the videotape is admissible as a business record under Supreme Court Rule 236 (103 Ill. 2d R. 236.) This rule states that a record is admissible "if made in the regular course of

any business, and if it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter." 103 Ill. 2d. R. 236(a).

"The credibility of any business record depends upon the regular, prompt and systematic nature of the entries and the fact that they are relied on in the operation of a business." (*Ocasio-Morales v. Fulton Machine Co.* (1973), 10 Ill. App. 3d 719, 725, 295 N.E.2d 329, 334.) It is the routine nature of these entries which adds to their trustworthiness. (See 10 Ill. App. 3d 719, 725, 295 N.E.2d 329, 334.) The videotape here was not made in the regular course of business, but grew out of the difficulties that arose between plaintiff and the union. (See *Erickson v. Ottawa Travel Center, Inc.* (1979), 69 Ill. App. 3d 108, 111, 387 N.E.2d 49, 52.) Plant manager Brekhus testified that the videotaping was done by security personnel pursuant to his instructions. He then stated: "Those instructions are to film all activities at the gate, at the tent or the picket house, whatever the case might be, whenever those activities are unusual." Thus, the videotaping was focused upon the union activities near the plant gate. Furthermore, the guards were instructed to tape only unusual activities. This was not a regular, systematic, or routine record-keeping system. Moreover, Illinois courts have found that where records are kept in anticipation of litigation, they are not admissible as business records. (See *People v. ex rel. Schacht v. Main Insurance Co.* (1983), 114 Ill. App. 3d 334, 344, 448 N.E.2d 950, 957; *Ocasio-Morales v. Fulton Machine Co.* (1973), 10 Ill. App. 3d 719, 725, 295 N.E.2d 329, 334.) Consequently, this videotape was not admissible under the business-records rule.

For these reasons, I can find no abuse of discretion in the trial court's refusal to admit the videotape into evidence, and I would affirm the judgment of the circuit court of Massac County.