April 19, 1999

No. 2--97--0778

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE OF ) Appeal from the Circuit Court

ILLINOIS, ) of Boone County.

)

Plaintiff-Appellee, )

)

v. ) No. 96--CF--60

)

TIMOTHY R. JAMES, ) Honorable

) Gerald F. Grubb,

Defendant-Appellant. ) Judge, Presiding.

_________________________________________________________________

JUSTICE RAPP delivered the opinion of the court:

Defendant, Timothy R. James, appeals his conviction of unlawful delivery of a controlled substance (720 ILCS 570/401(a)(2)(A) (West 1994)).  Defendant argues that the prosecutor's questions to the jury during 
voir dire
 regarding jurors' possible prior illegal drug use denied him of the right to an impartial jury.  We affirm.

Defendant was charged with unlawful delivery of 15 grams or more, but less than 100 grams, of cocaine.  720 ILCS 570/401(a)(2)(A) (West 1994).  The matter proceeded to a jury trial.

At the beginning of 
voir dire
, the panel of prospective jurors was sworn by the clerk.  The trial judge permitted the attorneys to question the prospective jurors.  The prosecutor, without objection by defense counsel, asked all but one of the prospective jurors who were ultimately seated as jurors questions regarding their prior illegal drug use.  Those questions are summarized as follows:

The prosecutor asked one juror, "Have you ever used or had exposure to cocaine or any narcotic substance?"  That juror replied, "No."

The prosecutor asked another juror, "Have you ever used or had exposure to any narcotic substance?"  That juror also denied any use.

The following colloquy then transpired between the prosecutor and yet another juror:

Prosecutor: "All right.  Have you ever been exposed to any narcotic substance?"

Juror: "Yes."

Prosecutor: "Is that something you're comfortable talking about in court?"

Juror: "Exposed meaning have I ever been around it in the use of it?"

Prosecutor: "No, have you ever used?"

Juror: "No, not narcotics, no.  Marijuana, yes."

Prosecutor: "Have you been around cannabis?"

Juror: "Yes; yes."

Prosecutor: "Can I presume this is the old college days, that kind of thing?"

Juror: "Yes."

Prosecutor: "Okay.  Cocaine, heroin, that stuff is pretty much out?"

Juror: "No.  I've never been around it, huh-uh."

The following colloquy then transpired between the prosecutor and another juror:

Prosecutor: "Have you ever used any illegal substances yourself?"

Juror: "I've tried cannabis a few times."

Prosecutor: "How long ago was that?

Juror: "Oh, back when I was in the fraternity so probably four years ago, three years ago."

Prosecutor: "Where is it you went to school?"

Juror: "Eastern Illinois."

Prosecutor: "You don't currently use?"

Juror: "No."

The prosecutor then asked another juror, "Have you ever used an illegal drug?"  The juror denied any use.

The prosecutor asked yet another juror, "Ever been exposed to an illegal drug?"  That juror replied, "No."

The prosecutor asked another juror, "Have you ever used a narcotic substance?"  The juror replied, "No, sir."

After denying that he had ever advocated the legalization of any illegal drug, one juror was asked by the prosecutor, "Therefore, I can assume that you've never used or been exposed to a narcotic substance."  That juror replied, "Yes."

The prosecutor asked another juror, "Any exposure in your life experience to a controlled substance?"  The juror replied, "No."

The prosecutor asked another juror, "And you yourself have never used any illegal drug?"  The juror stated, "Absolutely not."

The prosecutor asked another juror, "And you've never had any exposure to a narcotic substance?"  The juror said, "No."

Only one juror was not asked about her use of illegal drugs by the prosecutor.  We note that the trial judge did not intervene 
sua sponte
 to this questioning by the prosecutor; in fact, the trial judge also asked one potential juror, "I take it, then, you have been a user of drugs as well?"  The potential juror replied, "Yes, I have."  That potential juror was subsequently excused from jury service.

At trial, Greg Carlson testified that he was a former friend and business acquaintance of defendant between 1993 and 1994.  Carlson would purchase cocaine from defendant in various amounts of less than an ounce and then resell it.  Carlson's purchases from defendant usually took place at defendant's home located in Belvidere, Illinois.  The purchases occurred approximately 700 to 900 times.  Carlson also accompanied defendant on 75 to 100 trips to Chicago to buy drugs from his supplier, Henry Maynes.  Defendant would usually purchase one to two ounces from Maynes.

Carlson's relationship with defendant terminated in the fall of 1994 when Carlson quit using cocaine and moved to Missouri.  Carlson began working as an informant for the FBI.  In January 1995, Carlson was contacted by Mike Dudley of the FBI.  Dudley inquired whether Carlson could still purchase cocaine from his supplier.  Carlson agreed to do so, receiving a total of $600 for his cooperation.

Carlson testified that on January 29, 1995, he went to defendant's house and asked him whether he could purchase an ounce of cocaine.  Defendant said yes, went into another room and made a phone call, then emerged and said, "yep, tomorrow at noon."  The men made arrangements for defendant to be called by Carlson the next morning.

Carlson then contacted Mike Dudley and told him about the order.  Dudley instructed Carlson to be present at the Rockford FBI headquarters the next day, January 30, 1995.  Carlson testified that, while at the Rockford FBI headquarters, he was searched, wired, and provided with money to purchase cocaine.

Carlson called defendant's house.  Defendant told him to drive over.  Carlson arrived at defendant's home, now located in Rockford, at noon.  Carlson then drove defendant to 144 Gladys in Belvidere.  There defendant told Carlson that the drugs were not ready.  Several times beginning at 12:37 p.m., Carlson was told to leave and come back to 144 Gladys, each time because the requested quantity of drugs was not yet available.  At one point, defendant told Carlson that he could buy ¼ ounce, then come back later for the rest, but defendant advised Carlson to wait for the whole amount "because it would be better [quality]."  Commenting on the quality of the cocaine, defendant stated that he had tried a line.  Between noon and 5:06 p.m., Carlson made six trips to 144 Gladys.

On the sixth trip, defendant came out to the automobile that Carlson was in.  He handed Carlson what he represented to be one ounce of cocaine, and Carlson tendered $1,150 to defendant.  Defendant returned to the house.  Shortly thereafter defendant returned to Carlson's car and Carlson drove defendant to Scott Gerkhe's house in Belvidere where he dropped defendant off.  After defendant was dropped off, Carlson met with Dudley and gave him the cocaine.

The telephone and in-person conversations associated with the preceding conversations were electronically monitored and taped.  The audiotapes were played at trial.

Dudley testified that he provided audio surveillance by monitoring the communication between Carlson and any person,  including defendant.  Dudley interviewed defendant at defendant's home in Rockford on January 11, 1996.  Defendant was not in custody at the time.  During this conversation, defendant initially denied being a part of the January 30, 1995, transaction.  Dudley then played a portion of the tape in which defendant said that he weighed the cocaine and it came to 28 grams.  At that point, defendant admitted that he sold the cocaine to Carlson.  Defendant said he would cooperate with law enforcement on the condition that he not go to prison.  Dudley told defendant that he  could not make any representations to defendant and that sentencing would ultimately be up to the court.  Dudley told defendant that he wanted information about the January 30, 1995, transaction, assistance with the Marco Ramirez investigation, and information concerning defendant's drug-related ties to Chicago.

Defendant indicated that he was the "middle man" in the January 30 transaction.  Gary Anderson had procured the cocaine to be tendered to Carlson; the contraband was tendered to defendant, who delivered it to Carlson.

With regard to his Chicago drug-trade associates, defendant indicated that he had purchased several one-ounce quantities of cocaine from Henry Maynes and that he made one two-ounce purchase of cocaine from Henry Maynes.  Additionally, defendant said that in the fall of 1994 he purchased three or four ¼-kilo quantities of cocaine for $7,200 each.

The contraband recovered in the January 30 transaction was tested at the DEA crime lab.  It was found to contain 23.7 grams of cocaine.

Defendant asserted the defense of entrapment.  In that regard, defendant's wife, Rebecca, testified that, after meeting with Carlson in March 1994, Carlson and his girlfriend spent almost every evening at defendant's home.  The couples watched movies, played cards, and snorted cocaine.  In August 1994, defendant and Rebecca moved to Rockford to get away from drugs.  When it became clear that Carlson and his girlfriend intended to continue visiting, Rebecca told them that she did not want them in her house again.  Carlson became very upset and vindictive.  Rebecca testified that defendant never used cocaine again after they moved to Rockford.

Rebecca did not see Carlson again until January 29, 1995, when he showed up at defendant's house seeking cocaine.  According to Rebecca, defendant told Carlson that he no longer used drugs and that Carlson could leave if that was what he came for.  Carlson initially relented but then badgered defendant to "make a call to somebody."

Eventually, Rebecca called defendant into the kitchen, where she told defendant to call someone so as to get Carlson out of her house.  Rebecca left the kitchen to talk to Carlson's girlfriend.  Defendant and Carlson went into the kitchen and talked.  They came out and defendant made a phone call.  Carlson left.  The next morning, Carlson came by to pick up defendant.

On March 7, 1997, the jury found defendant guilty of unlawful delivery of a controlled substance.  On June 24, 1997, the trial court heard and denied defendant's posttrial motion and sentenced defendant to nine years' imprisonment.  Defendant's notice of appeal was filed July 18, 1997.

On appeal, defendant contends that questioning venire members about their prior illegal drug use was unconstitutional.  Defendant argues that his conviction must be reversed and the cause remanded for a new trial because the prosecutor's questions to the jurors during 
voir dire
 regarding their prior illegal drug use denied defendant his right to an impartial jury.  This appears to be a question of first impression in Illinois.

The State argues that defendant has waived this issue by failing to object to the prosecutor's questions during 
voir dire
  (see 
People v. Towns
, 157 Ill. 2d 90, 99-100 (1993)) and by failing to present this issue in his posttrial motion (see 
People v. Collins
, 106 Ill. 2d 237, 271 (1985)).  Defendant admits that he failed to preserve the issue for review but argues that the failure to provide him with an impartial jury violates the minimal standards of due process.  See 
Turner v. Louisiana
, 379 U.S. 466, 471-72, 13 L. Ed. 2d 424, 428, 85 S. Ct. 546, 549 (1965); see also 
People v. Boston
, 271 Ill. App. 3d 358, 360 (1995) ("The right to an impartial jury is so fundamental to due process that any infringement of that right requires reversal by a reviewing court"), citing 
People v. Cole
, 54 Ill. 2d 401, 411 (1973).  We will therefore consider this issue.

The purpose of 
voir dire
 is to select fair and impartial jurors.  
People v. Love
, 222 Ill. App. 3d 428, 431 (1991).  Furthermore, 
voir dire
 may not be used by either party to pre-

educate or indoctrinate prospective jurors to a particular theory or defense, or to impanel jurors with particular predispositions.  
People v. Lanter
, 230 Ill. App. 3d 72, 75 (1992).  Circuit courts have broad discretion in conducting and managing 
voir dire
, and the decision to allow certain questions of prospective jurors is within this discretion.  
People v. Dow
, 240 Ill. App. 3d 392, 396-97 (1992).  An abuse of the court's discretion will be found only if, after reviewing the record, it is determined that the conduct of the court thwarted the selection of an impartial jury.  
Kingston v. Turner
, 115 Ill. 2d 445, 465 (1987).

   Jury service is not voluntary, nor is submission to a prosecutor's questions during 
voir dire
.  
Voir dire
 literally means "[t]o speak the truth."  Black's Law Dictionary 1575 (6th ed. 1990).  As the court stated in 
Bal Theatre Corp. v. Paramount Film Distributing Corp.
, 206 F. Supp. 708 (N.D. Cal. 1962), jurors are required to: 

"honestly and conscientiously answer the real implications of the questions asked, no more and no less.  And, while the sweep of questions may be general and broad, the affirmative duty of the prospective juror is to answer as fully and completely as possible under the circumstances."  
Bal Theatre Corp.
, 206 F. Supp. at 721.

"The search for an impartial juror is a balancing effort by the court between the competing parties, the public and the potential juror."  
Brandborg v. Lucas
, 891 F. Supp. 352, 356 (E.D. Tex. 1995).  The court in 
Brandborg
 recognized that "[w]hile the parties have attorneys to champion their rights, the court must protect the [constitutional] privacy rights of the prospective juror."  
Brandborg
, 891 F. Supp. at 356.  Just as the court must protect prospective jurors' constitutional right to privacy, the court must also protect other constitutional rights of prospective jurors.  See 
J.E.B. v. Alabama ex rel. T.B.
, 511 U.S. 127, 128 L. Ed. 2d 89, 114 S. Ct. 1419 (1994) (peremptory challenges based upon gender); 
Batson v. Kentucky
, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986) (peremptory challenges based upon race).  The court in 
Brandborg
 noted that "nothing about becoming a prospective juror amounts to a willing waiver of an expectation of privacy."  
Brandborg
, 891 F. Supp. at 357.  Likewise, nothing about becoming a prospective juror amounts to a willing waiver of one's other constitutional rights.

Defendant contends that asking sworn jurors whether they ever used illegal drugs compelled them to be witnesses against themselves in violation of the fifth amendment.  The fifth amendment provides, in part, "No person *** shall be compelled in any criminal case to be a witness against himself ***."  U.S. Const., amend. V; see also Ill. Const. 1970, art. I, §10.  The guarantee against self-incrimination applies to every type of tribunal and inquisitor.  
Kanter v. Clerk of Circuit Court
, 108 Ill. App. 287, 301 (1903).

The privilege against self-incrimination is not dependent upon the nature of the cause in which the testimony is sought or is to be used.  It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it.  
McCarthy v. Arndstein
, 266 U.S. 34, 40, 69 L. Ed. 158, 161, 45 S. Ct. 16, 17 (1924).  The privilege applies both in court and in investigations before quasi-judicial bodies, to examinations before legislative bodies and committees, and to examinations before an officer or a body that has the power to subpoena and compel the attendance of witnesses.  81 Am. Jur. 2d 
Witnesses
 §88 (1992).  The purpose of the guarantee is to protect the witness from prosecution and punishment based on his own testimony.  
Halpin v. Scotti
, 415 Ill. 104, 108 (1953).

In 
Burt v. Panjaud
, 99 U.S. 180, 25 L. Ed. 451 (1879), a venireman declined to answer whether "he had aided or abetted the late rebellion against the United States."  
Burt
, 99 U.S. at 180, 25 L. Ed. at 452.  The Supreme Court in 
Burt
 stated:

"But we are further of [the] opinion that a juror is, no more than a witness, obliged to disclose on oath his guilt of any crime, or of any act which would disgrace him, in order to test his qualification as a juror.  The question asked him, if answered in the affirmative, would have admitted his guilt of the crime of treason.  Whether pardoned by a general amnesty or not pardoned, we think the crime was one which he could not be required to disclose in this manner."  
Burt
, 99 U.S. at 181, 25 L. Ed. at 453.

Although 
Burt
 acknowledged that a potential juror has a constitutional right against self-incrimination, it found that the potential juror was not on the jury and that the record did not show that in striking the juror any right of the defendant was abridged or lost.  
Burt
, 99 U.S. at 181, 25 L. Ed. at 453.

Similarly, in 
Ryder v. State
, 28 S.E. 246 (Ga. 1897), the Georgia Supreme Court stated:

"Certainly, neither the court nor counsel should ask any question which would involve a breach of the juror's privilege to refuse to answer on the ground that so doing  would tend to incriminate, or otherwise disgrace, him ***."  
Ryder
, 28 S.E. at 248.

To be meaningful, the right against self-incrimination must preclude the offending questions from being asked of any prospective jurors.  See 
United States v. Padilla-Valenzuela
, 896 F. Supp. 968, 972 (D. Ariz. 1995) (the right to privacy must preclude the offending questions from being asked of any prospective jurors).  We hold that the prosecutor's questions of potential jurors regarding their prior illegal drug use was improper in that such questions compelled potential jurors to be witnesses against themselves in violation of the fifth amendment.

The State argues, however, that such questions were well within the scope of questioning during 
voir dire
 where the purpose was to discover whether a prospective juror may be biased.  See 
Dow
, 240 Ill. App. 3d at 397.  As we noted earlier, the trial judge also asked one potential juror about his prior drug use.  While we agree that a potential juror's views concerning illegal drugs is a proper scope of inquiry during 
voir dire
, we believe such information may be elicited without trampling the constitutional rights of potential jurors.

Defendant contends that the questions regarding prior illegal drug use posed by the prosecutor to the jurors compelled jurors to possibly incriminate themselves and undermined his right to an impartial jury.  Defendant asserts that, once seated, jurors might well be partial to the prosecution out of fear that a "not guilty" verdict could result in their drug use being investigated and exposed by dissatisfied or vindictive prosecutors. We disagree with defendant.

We believe it is arguable that defendant sat quietly and did not object to this questioning because, as part of defendant's trial strategy, the potential jurors might become sympathetic to defendant, particularly if they have been prior consumers of illegal drugs.  It is interesting to note that nine jurors were excused for cause on defendant's request and that the jury was impaneled at a time when defendant had seven peremptory challenges remaining.  "The failure to challenge a juror for cause or by peremptory challenge waives any objection to that juror."  
Collins
, 106 Ill. 2d at 271.  Here, defendant accepted the panel of jurors that ultimately decided this case, and he cannot now be heard to complain that he was denied a fair trial.  
Collins
, 106 Ill. 2d at 271-72.

We hold that the prosecutor's questions to jurors regarding their prior illegal drug use were improper, and we condemn this practice.  However, defendant and his counsel, in their trial strategy, did not object to such questioning during 
voir dire
, when it could have been corrected, nor did they raise this issue in a posttrial motion.  Therefore, we find this to be a procedural default.  See 
People v. Free
, 122 Ill. 2d 367, 379-80 (1988) (Ryan, J., specially concurring).

Defendant has not presented any evidence to support his claim that the questions posed by the prosecutor to the prospective jurors regarding their illegal drug use denied him his right to an impartial jury.  Moreover, defendant has failed to point to any evidence to sustain his burden of showing that the jurors had a disqualifying state of mind or that his claim is based on more than mere suspicion and speculation.  See 
People v. Cole
, 54 Ill. 2d at 413 ("The burden of showing that the juror possesses a disqualifying state of mind is on the party challenging the juror").  Although we condemn the practice of asking potential jurors about their prior illegal drug use, we conclude the evidence of defendant's guilt was strong and the jury's verdict was supported by the evidence.  Defendant has not established a nexus between a violation of the jurors' right against self-incrimination and the denial of a fair and impartial jury to this defendant. 

For the foregoing reasons, we affirm the judgment of the circuit court of Boone County.

Affirmed.

BOWMAN, P.J., and McLAREN, J., concur.