THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* LEONARD A. SHERMAN, Director of the . Department of Professional Regulation, Plaintiff-Appellant, v. YVONNE CRYNS, Defendant-Appellee.

Second District No. 2—01—0952

Opinion filed January 28, 2002.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Diane M. Potts, Assistant Attorney General, of counsel), for appellant.

James T. Harrison, of Harrison Law Offices, P.C., of Woodstock, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

In this interlocutory appeal plaintiff, the People of the State of Illinois *ex rel.* Leonard Sherman, Director of the Illinois Department of Professional Regulation, appeals from the judgment of the circuit court of McHenry County denying its motion for a preliminary injunction against defendant, Yvonne Cryns. Plaintiff had sought to enjoin defendant from practicing nursing or midwifery without a license. On appeal plaintiff contends that the trial court erred (1) in directing a finding for defendant and denying plaintiff's request for preliminary injunction, and (2) in finding that it could not draw any negative inferences from defendant's refusal to testify under the fifth amendment (U.S. Const., amend. V).

Plaintiff filed a complaint for injunctive relief against defendant pursuant to section 20—75(a) of the Nursing and Advanced Practice Nursing Act (Act) (225 ILCS 65/20—75(a) (West 1998)). Section 20—75(a) provided that the Director of the Department of Professional Regulation (Director), in the name of the People of the State of Illinois, through the Attorney General of Illinois, may petition for an order enjoining a violation of the Act or for an order enforcing compliance with the Act. The complaint alleged that defendant violated a cease and desist order issued by the Director on April 7, 2000, ordering her to immediately cease and desist the practice of nursing and midwifery in Illinois until she complied with certain provisions of the Act pertaining to licensing as a nurse or advanced practice nurse. The complaint alleged that the violation occurred when defendant assisted with the birth of a baby, Spencer Verzi, at the Verzi home in Round Lake Beach on April 19, 2000.

Pursuant to plaintiff's complaint, the court entered a temporary restraining order against defendant and ordered a hearing to be held on plaintiff's motion for preliminary injunction. At the subsequent hearing on the motion, Louis Verzi, father of Spencer Verzi, testified regarding the August 19, 2000, birth of his son. Verzi stated that he and his wife, Heather, had hired defendant to advise and assist them

in delivering their baby at home. Verzi related that they had elected to have the baby at home as opposed to a hospital because of their alternative ideas regarding health care that were not shared by most doctors. According to Verzi, he and his wife did not believe that childbirth was a medical procedure but rather a natural human process. They did not want a doctor or a nurse to deliver their baby. Verzi stated that Heather's mother was their doctor, *i.e.*, that they relied on her advice regarding health issues.

Verzi stated that defendant understood their views and agreed to assist them in the water birth process that the Verzis chose as the method for giving birth to their child. The procedure involved giving birth while the mother was partially submerged in a birthing pool. Water birth was not available in any nearby hospitals. Verzi said that defendant never told his wife and him that she was present to act as a nurse nor did he believe that that was defendant's role.

During Heather's pregnancy, the couple met with defendant so she could "check up" on Heather and make certain her pregnancy was proceeding "okay." Three or four months into the pregnancy defendant used a Doppler, an instrument that monitors the baby's heartbeat. On other visits, at the Verzis' request, defendant used a fetoscope, a stethoscope device used to listen to the baby's heartbeat.

Verzi recalled that, about a couple of months before the birth of his son, defendant informed him that a cease and desist order existed against her. Defendant told the Verzis that the order stated that she was not to assist in the delivery of babies. Verzi understood that this included the practice of midwifery. Verzi said that, regardless of the cease and desist order, he and his wife had come to trust defendant and still wanted her to assist in the delivery of their baby.

Verzi related that at about 10:30 a.m. on August 19, 2000, Heather's water broke. Defendant was called and arrived between 1 and 1:30 p.m. During the time she was at the Verzi home, defendant used the fetoscope four or five times. She also used a Doppler and an Ambu bag, or respiratory bag, after the baby was born.

At about 3:45 p.m. Heather began to give birth to Spencer. His left foot emerged first. Verzi recalled that at some point during the birthing process Heather asked defendant to pull out the baby. Defendant replied that she could not do that and instructed Heather to push out the baby because defendant did not know exactly what was right for the baby, but Heather's body would know the correct thing to do. Verzi stated that when matters became urgent, defendant attempted to extract the baby.

When Spencer was born, he had a heartbeat but was not breathing. Defendant used the Ambu bag to administer cardiovascular

pulmonary resuscitation (CPR) to Spencer for approximately 10 minutes. When defendant's efforts to resuscitate the baby were unsuccessful, she asked those present to call 911. Defendant continued trying to resuscitate the baby until paramedics arrived. Verzi acknowledged that in electing to have a home birth he and his wife knew that medical assistance was not immediately available if medical complications arose during the birth.

Verzi was asked if he had received a videotape of the events that occurred at his home on August 19, 2000. The videotape had been delivered to the Verzis by a police officer on the night before the instant proceedings and subsequently picked up by the officer after the couple had viewed it. Verzi acknowledged that the videotape truly and accurately portrayed the events that took place and the persons present on that date. Verzi stated that he was not responsible for the videotaping although he may have stopped the camcorder one or two times during the taping. According to Verzi, the camcorder was turned on and off frequently through the tape recording. The videotape was not played in court.

The State moved for the admission of the videotape, and defendant objected based on lack of foundation. The court commented that it believed that the videotape's admissibility depended upon whether someone testified that it was a true and accurate depiction of that which it portrayed. The court then found that the foundation for its admission was sufficient and admitted the videotape over defendant's objection.

The following description of what appears on the videotape is adopted in large part from the State's brief, which, from our review of the videotape, accurately depicts events that occurred during Spencer's birth. The videotape reveals that when Spencer began to be born he was in a breech position, *i.e.*, exiting the birth canal feet first. The baby's left foot exited the birth canal first. The videotape shows that soon after the baby's foot appeared, defendant checked the baby's heartbeat with her fetoscope.

While Heather was laboring with only the baby's foot being born, defendant performed a digital examination on Heather's cervix to check that the cervix had fully dilated and that "there [wasn't] any more cervix in the way." After a few minutes she used her Doppler and fetoscope to again listen to the baby's heartbeat and instructed Heather to change positions to facilitate her examination. Heather labored for almost 20 minutes with only the baby's left foot being born. She complained of pain and asked defendant to help pull the baby out a little. Defendant refused and told Heather, "You know how much you can push the baby out. I don't know how much the baby should come out."

Shortly thereafter, the baby's right foot and bottom were born. With Heather's next push, the scrotum and part of the umbilical cord were visible outside the birth canal. Because it was apparent that the baby was a boy, Louis and Heather stated that the baby would be named Spencer Raymond Verzi.

A couple of minutes passed without any more of the baby being born, and defendant stated that she wanted to check on the health of the baby. Defendant used the Doppler to perform the examination. When she could not get a heartbeat for the baby, she instructed Heather to change positions and again listened with her equipment. Defendant still could not get a steady heartbeat and told Heather to "get the baby out" immediately.

Heather began pushing and defendant grabbed onto the part of the baby outside the birth canal. The water made it difficult to grab onto the baby and therefore defendant ordered Heather to stand up and get out of the birthing pool. Once Heather was on the rug, defendant tried to listen for the baby's heartbeat with the fetoscope but again could not get a steady beat. Defendant told Heather to "get this baby born." In the next series of pushes, the remainder of the baby's body was born except for his head, which remained in the vaginal canal. Defendant ordered Heather to push hard to get the head out. As Heather pushed, defendant inserted her fingers into the vaginal opening and worked to stretch and loosen the opening so that the baby's head could pass through it. Defendant also pulled and twisted the baby's torso and tried to manipulate him through the opening. As she did so, defendant ordered Heather to push and not to take any breaks. The baby's head exited the birth canal at approximately 4:30 p.m.

Spencer Verzi was unconscious upon birth. Defendant quickly rubbed a warm towel over him and began trying to resuscitate him. Defendant used her Ambu bag to push air into the baby's lungs. Approximately every minute thereafter, defendant stopped her resuscitation attempts to listen to the baby's heartbeat with the fetoscope. After using the Ambu bag for about 10 minutes, defendant tried mouth-to-mouth resuscitation. When that was unsuccessful, Cryns advised the Verzis to call 911.

In addition to Verzi, plaintiff called defendant as a witness. Plaintiff asked defendant whether she was certified as a midwife or licensed as a nurse in Illinois; whether a cease and desist order had been issued against her by the Department of Professional Regulation; whether she was present and assisted in the delivery of Spencer Verzi in violation of the cease and desist order; whether she had been hired as a midwife by the Verzis and paid to assist in the birth of their baby;

whether, after informing the Verzis that a cease and desist order had been entered against her, she informed them that no one else would take them on as a midwife at Heather's stage of pregnancy; and whether she told the Verzis after assisting in Spencer's birth that she should not be present and that they should not tell anyone that she was there. Defendant refused to answer these questions and every other question asked by the State, invoking her fifth amendment rights.

Plaintiff rested its case, and defendant moved for a directed finding, arguing that plaintiff had presented no evidence showing that any acts engaged in at the Verzi home on August 19, 2000, constituted acts of nursing or acts of advanced practice nursing. The trial court granted the motion, finding that plaintiff had not met its burden of proof in establishing a basis for a preliminary injunction. The court stated:

"I am not a doctor. I am not a nurse. I am not the Department of Professional Regulation. I do not know what it is that—there is no evidence, there is no opinion that whatever occurred was the practice of nursing, the practice of midwifery, and I don't believe it is—at this point that they have established that there was a violation of a cease and desist order for the purpose of this Court to enter a preliminary injunction at this stage."

Plaintiff filed a timely notice of appeal from the trial court's decision. On May 7, 2001, this court issued its decision reversing the trial court's determination, finding that the trial court abused its discretion in ruling on plaintiff's request for a preliminary injunction without viewing the videotape entered into evidence. *People ex rel. Sherman v. Cryns*, 321 Ill. App. 3d 990, 993 (2001). We vacated the trial court's order and remanded the cause for the court to consider all of the evidence offered at the preliminary injunction hearing, including the videotape. *Cryns*, 321 Ill. App. 3d at 993-94.

Upon remand and after reviewing both the videotape and the transcript of the hearing in their entirety, the trial court reaffirmed its decision to grant defendant's motion for a directed finding and to deny plaintiff's request for a preliminary injunction. The court again expressed its belief "that there is no evidence in the record, opinion evidence or other evidence, from which this Court could conclude that the activities of [defendant] constituted the practice of nursing or midwifery." According to the court, "any such conclusion based upon the record would be guess or speculation."

This appeal ensued.

■ Initially, we address the issue defendant has raised in her brief regarding the admissibility of the videotape, as our determination relies in part upon what appears upon that videotape. We note that

defendant's raising of this issue does not require a cross-appeal. An appellee need not file a cross-appeal to preserve an argument ruled on adversely to the appellee in the trial court provided the court's judgment was not, at least in part, against him. *In re Marriage of DeLarco*, 313 Ill. App. 3d 107, 108 (2000). Here, the judgment was not against defendant and, therefore, we may consider the merits of this issue she raises.

At trial defendant objected to the admission of the videotape based on plaintiff's failure to lay a proper foundation for the tape recording, arguing, in part, that whoever made the recording should testify. The court ruled adversely to defendant, stating that all that was needed was testimony by someone that the videotape was a true and accurate depiction of that which it portrayed. Louis Verzi had previously testified that the videotape truly and accurately portrayed the events that occurred at his home on August 19, 2000. As a result, the court found that the foundation for the videotape's admission was sufficient and admitted the videotape.

■ The decision to admit a videotape into evidence is solely within the trial judge's discretion (*Palumbo v. Kuiken*, 201 Ill. App. 3d 785, 791 (1990)) and will not be reversed absent an abuse of discretion (*Missouri Portland Cement Co. v. United Cement, Lime, Gypsum & Allied Workers International Union, Division of Boilermakers, AFL-CIO, Local No. 438*, 145 Ill. App. 3d 1023, 1027 (1986)). A videotape can be admitted if it is identified by a witness as a portrayal of certain facts relevant to a particular issue and is verified by that witness with personal knowledge as a correct representation of these facts. *Missouri Portland Cement Co.*, 145 Ill. App. 3d at 1027. "Verification may be furnished by the testimony of any competent witness who has sufficient knowledge to testify that the videotape fully represents what it purports to portray." *Missouri Portland Cement Co.*, 145 Ill. App. 3d at 1027. The testimony of the cameraman is not necessary for the admission of the videotape into evidence. *Missouri Portland Cement Co.*, 145 Ill. App. 3d at 1027.

■ On appeal defendant contends that the trial court abused its discretion in admitting the videotape. Defendant maintains that, although Verzi testified that the videotape he watched at home on the night before the hearing depicted events that occurred during the labor and birth of his child, there was no verification at the hearing that the videotape admitted into evidence was the same one Verzi had viewed. Defendant argues that Verzi's testimony was insufficient to lay a foundation for the admission of the videotape offered at trial.

As plaintiff points out, however, defendant has failed to cite any authority stating that a videotape must be viewed at trial in order to

establish a foundation for its admission into evidence. Moreover, we agree with plaintiff that defendant's suggestion that the videotape entered into evidence might not have been the same one Verzi saw is unsubstantiated, given the content of the tape. We have viewed the videotape in the record, and it clearly portrays the birth of Spencer Verzi. As plaintiff correctly states, the date and time of the birth are identified, as are defendant's presence and assistance in the birth.

Verzi was a competent witness to identify the videotape as portraying the labor and birth of his child. As one present for the events that occurred on August 19, he possessed the personal knowledge to verify that the videotape constituted a correct representation of the events and the persons present. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the videotape into evidence.

■ Defendant also complains of plaintiff's inclusion in the appendix of its brief of a shortened version of the original videotape containing short segments reproduced from that tape. Defendant argues that it is improper to introduce new evidence for the first time on appeal and to supplement the record with materials not considered by the trial court. Defendant's argument is meritless. While materials not taken from the record generally may not be placed before an appellate court by way of an appendix (*Hubeny v. Chairse*, 305 Ill. App. 3d 1038, 1042 (1999)), this is not what occurred here. The excerpts on the videotape in the appendix are taken from the original videotape, which the trial court did admit into evidence and did view. Therefore, the excerpts do not constitute new evidence or new materials not considered by the trial court.

Moreover, plaintiff is correct in its position that, pursuant to Supreme Court Rule 342(a), an appellant's brief is to include in its appendix "other materials from the record which are the basis of the appeal or pertinent to it" (155 Ill. 2d R. 342(a)). The portions of the original videotape that are included in the record are pertinent to plaintiff's appeal because they form the basis of its contention that defendant's assistance in delivering the Verzi baby constituted the practice of nursing. Furthermore, we agree with plaintiff that copying five portions from the original videotape for inclusion in its appendix is comparable to copying pages of a trial transcript that form the basis of or are pertinent to an appellant's appeal. Consequently, we find nothing improper in the inclusion in plaintiff's appendix of a shortened videotape containing those segments pertinent to plaintiff's appeal.

■ Defendant also contends that it was improper for plaintiff to cite in its brief to specific places on the videotape that showed defendant performing certain actions during the delivery of the baby.

However, the videotape constituted an exhibit that was admitted into evidence and, under Supreme Court Rules 341(e)(6) and (e)(7) (188 Ill. 2d Rs. 341(e)(6), (e)(7)), citation to it was proper. Defendant additionally maintains that it was improper for plaintiff to describe in its brief defendant's actions during the delivery because doing so was equivalent to testifying as a witness. We, however, find no merit to this argument. Stating what one believes a videotape shows is no different from expressing an opinion regarding what a photograph in evidence depicts. In each instance the opposing party can also express its opinion regarding the nature and content of the exhibit. But, as plaintiff points out, defendant has not expressed her views regarding what is depicted by the images relied upon by plaintiff. We conclude that plaintiff's reference to the videotape constitutes proper citation to the record in support of its argument.

Having concluded that the trial court's admission of the videotape was proper, we proceed to plaintiff's contention that the court erred in granting defendant's motion for a directed finding at the conclusion of plaintiff's case in chief. Plaintiff maintains that, contrary to the trial court's determination, evidence was presented that defendant was practicing nursing or midwifery without a license on August 19, 2000, when she assisted in the delivery of the Verzi baby.

■ In a nonjury case the defendant may, at the close of the plaintiff's case, move for a finding or a judgment in his favor. 735 ILCS 5/2—1110 (West 1998). In ruling on such a motion, the trial court must follow a two-step analysis, first determining as a matter of law whether the plaintiff has made a *prima facie* case and entering a judgment for the defendant if the plaintiff has failed to do so. *Evans v. Gurnee Inns, Inc.*, 268 Ill. App. 3d 1098, 1102 (1994). If the court finds that the plaintiff has established a *prima facie* case, it must then weigh the evidence, including that which favors the defendant. *Orbeta v. Gomez*, 315 Ill. App. 3d 687, 690 (2000). After weighing the evidence, the court applies the standard of proof required for the underlying cause to determine whether sufficient proof remains to sustain the plaintiff's *prima facie* case. *Wehde v. Regional Transportation Authority*, 237 Ill. App. 3d 664, 676 (1992). If the court decides that evidence necessary to the plaintiff's *prima facie* case has been negated, the court should grant the motion for a directed finding and enter judgment for the defendant. *Orbeta*, 315 Ill. App. 3d at 690. The trial court's decision under the second part of this analysis will not be disturbed unless it is contrary to the manifest weight of the evidence. *Estate of Price v. Universal Casualty Co.*, 322 Ill. App. 3d 514, 517 (2001).

■ In the present case the trial court decided only that plaintiff

had failed to present *any* evidence that defendant was practicing nursing or midwifery in violation of the Nursing and Advanced Practice Nursing Act (225 ILCS 65/5—1 *et seq.* (West 1998)), *i.e.*, that plaintiff failed to establish a *prima facie* case as a matter of law. When a trial court determines that the plaintiff has failed to establish a *prima facie* case as a matter of law, the reviewing court must consider that determination under a *de novo* standard of review. *Zamarron v. Pucinski*, 282 Ill. App. 3d 354, 358 (1996).

■ To establish a *prima facie* case, the plaintiff must present at least some evidence on each element essential to its cause of action. *Elane v. St. Bernard Hospital*, 284 Ill. App. 3d 865, 872 (1996). Here, plaintiff was seeking a preliminary injunction against defendant. When a person is practicing nursing without a license in Illinois, the State possesses the statutory authority to petition the court for an injunction against that person. 225 ILCS 65/20—75 (West 1998). A statutory claim for injunctive relief need not satisfy the traditional principles of equity because it is based upon the presumption that public harm occurs when the statute is violated. *Midland Enterprises, Inc. v. City of Elmhurst*, 226 Ill. App. 3d 494, 504 (1993). Rather, the State is required to show only that the statute was violated and that the statute relied upon specifically allows injunctive relief. *Midland Enterprises*, 226 Ill. App. 3d at 504. In the present case, plaintiff made a *prima facie* case that defendant was practicing nursing or midwifery without a license through the testimony of Louis Verzi as well as the videotape admitted into evidence.

Because the practice of nursing affects the public health, safety, and welfare of Illinois citizens, the legislature enacted the Nursing and Advanced Practice Nursing Act to regulate and control the practice. 225 ILCS 65/5—5 (West 1998). In carrying out its purpose, the Act is to be liberally construed. 225 ILCS 65/5—5 (West 1998). Under the Act "any person practicing or offering to practice professional and practical nursing in Illinois shall submit evidence that he or she is qualified to practice, and shall be licensed as provided under the Act." 225 ILCS 65/5—15 (West 1998). The Act further provides that "[n]o person shall practice or offer to practice professional or practical nursing in Illinois or use any title, sign, card or device to indicate that such a person is practicing professional or practical nursing unless such person has been licensed under the provisions of this Act." 225 ILCS 65/5—15 (West 1998).

Pursuant to section 5—10(1) of the Act, "[r]egistered professional nursing practice" includes, in pertinent part:

"all nursing specialities and means the performance of any nursing act based upon professional knowledge, judgment, and skills

acquired by means of completion of an approved registered professional nursing education program. A registered professional nurse provides nursing care emphasizing the importance of the whole and the interdependence of its parts through the nursing process to individuals, groups, families, or communities, that includes but is not limited to: (1) the assessment of healthcare needs, nursing diagnosis, planning, implementation, and nursing evaluation; (2) the promotion, maintenance, and restoration of health; (3) counseling, patient education, health education, and patient advocacy." 225 ILCS 65/5—10(l) (West 1998).

A nurse specializing in the delivery of babies is referred to as a certified nurse midwife in the Act and is categorized as an "[a]dvanced practice nurse" (225 ILCS 65/15—5 (West 1998)). An advanced practice nurse is an individual licensed as a registered professional nurse under the Act. 225 ILCS 65/15—5 (West 1998). A certified nurse midwife must work in collaboration with a licensed physician. 225 ILCS 65/15—5 (West 1998). Once a midwife has satisfied the foregoing requirements, she can care for patients by using "medical, therapeutic, and corrective measures to treat illness and improve health status." 225 ILCS 65/15—5 (West 1998).

■ In the present case Louis Verzi testified that he and his wife, Heather, had hired and paid defendant to advise and assist them in delivering their baby at home. According to Verzi, they had not wanted a doctor or nurse to deliver their baby. At some point during Heather's pregnancy the couple learned that a cease and desist order had been issued against defendant, precluding her from assisting in the delivery of babies. It was Verzi's understanding that defendant was told not to practice midwifery. According to Verzi, he did not know specifically what the term "midwifery" meant. Nonetheless, midwifery is defined as "the art or act of assisting at childbirth" (Webster's Third New International Dictionary 1432 (1993)), and, clearly, it was for this purpose, as testified to by Verzi, that he and his wife had hired defendant. Moreover, that defendant was hired by the Verzis as a midwife is evident from the videotape. On the videotape defendant's arrival at the Verzi home is announced as "Yvonne, the midwife, has arrived."

The videotape reveals that, as Heather began to give birth to the baby's foot, defendant stated that she wanted to examine Heather to make certain that there was no more cervix remaining in the vaginal canal to block the baby's passage. Defendant then performed a digital examination to determine if Heather was fully dilated. During Heather's labor, defendant checked the baby's heart rate on several occasions in utero, i.e., while the baby was still in the uterus, using a fetoscope. Also, during Heather's labor, particularly after the lower

half of the baby had been born, defendant used a device called a Doppler that she placed on Heather's stomach to monitor the baby's heartbeat.

Following one of defendant's checks with the Doppler, she ordered Heather out of the birthing pool and onto the rug, arranged her labor position, and repeatedly instructed her to "get this baby born." The videotape reveals that defendant used her fingers to stretch the vaginal opening to try to ease the baby's passage and both pulled and twisted the baby to manipulate him through the vaginal canal. Once the child was born, defendant cleaned him with a towel and began using her Ambu bag to push air into his lungs. The tape shows that about every minute thereafter defendant stopped her resuscitation efforts to listen to the baby's heartbeat with her fetoscope. After approximately 10 minutes of trying to resuscitate him with the Ambu bag, defendant tried mouth-to-mouth resuscitation. When this was unsuccessful, she advised the Verzis to call 911. She then reminded the Verzis that she was not supposed to be present and that they had previously discussed this fact. She asked that they not tell anyone that she had been assisting in the baby's delivery and asked that they hide her medical instruments.

Defendant's foregoing comments demonstrate that she knew her participation in Spencer's birth violated the Act. Moreover, her conduct during and after Heather's labor evidenced that she was practicing nursing or midwifery. We agree with plaintiff that, in checking Heather's cervix to determine if she was fully dilated and in checking the baby's heartbeat in utero with her fetoscope, defendant was assessing both Heather's and the baby's "healthcare needs" and making "nursing evaluation[s]" in violation of section 5—10(1) of the Act (225 ILCS 65/5—10(1) (West 1998)). Furthermore, defendant's attempts to promote, maintain, and restore Spencer's health when she pulled and twisted him through the vaginal opening and tried to resuscitate him after his birth also constituted additional violations of section 5—10(1) (225 ILCS 65/5—10(1) (West 1998)). These same actions constituted "corrective measures" to improve his health status and were further violations of the Act (225 ILCS 65/15—5 (West 1998)).

Also, we note that defendant's conduct in stretching Heather's vaginal opening with her hands to ease the passage of the baby's head through the opening and then pulling and twisting the baby's torso to manipulate him through the opening constituted more than mere "assisting" at childbirth. Rather, in physically removing or extracting the baby's head from the vaginal canal, defendant was participating in the actual delivery of the baby.

The Act sets forth the activities that the legislature considers to

constitute the practice of nursing. See 225 ILCS 65/5—10(1), 15—5 (West 1998). Additionally, the Act provides courts with the power to enjoin individuals who engage in these activities without the proper license. 225 ILCS 65/20—75(a) (West 1998). The videotape and Louis Verzi's testimony constituted sufficient evidence to establish a *prima facie* case that on August 19, 2000, defendant performed certain acts that constituted the practice of nursing and that, therefore, were prohibited for an individual without a nursing license. In our view, no "guess or speculation," as stated by the trial court in reaching its decision, was necessary on the trial court's part to reach such a conclusion. The Act "gives adequate notice of what duties a person without a nursing license is unable to perform" (*People v. Stults*, 291 Ill. App. 3d 71, 84 (1997)).

In *Stults* this court made the foregoing finding regarding section 3 of the former Illinois Nursing Act of 1987 (225 ILCS 65/3(1) (West 1996)). Subsequently, that provision became section 5—10(1) of the Nursing and Advanced Practice Nursing Act (225 ILCS 65/5—10(1) (West 2000)). The two provisions are similar, but section 5—10(1) is more definitive than the former provision. As a result, it provides more than "adequate" notice regarding the acts an individual without a nursing license cannot perform. Thus, the trial court could have applied the statute to defendant's actions to determine whether those actions constituted nursing.

We conclude that the trial court erred in finding that plaintiff presented no evidence from which the court could conclude that defendant's activities constituted the practice of nursing or midwifery. Plaintiff established a *prima facie* case that defendant was practicing nursing or midwifery without a license and, consequently, the trial court erred in granting defendant's motion for a directed finding.

■ Plaintiff also raises the contention on appeal that the trial court erred in finding that it could not draw any negative inferences from defendant's refusal to testify under the fifth amendment. Plaintiff asserts that the fifth amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them. However, this principle of law is not dispositive here. The record reveals that a criminal case was pending against defendant in Lake County, where Spencer Verzi's birth occurred. Thus, the danger existed that defendant's answers to plaintiff's questions could be used against her in her pending criminal case.

The purpose of the self-incrimination clause contained in the fifth amendment is to protect a witness from prosecution and punishment based on his own testimony. *People v. James*, 304 Ill. App. 3d 52, 59

(1999). "The privilege against self-incrimination may be invoked in any proceeding, civil or criminal, in which the witness reasonably believes that the information sought, or discoverable as a result of his testimony, could be used in a subsequent criminal proceeding against him." *Relsolelo v. Fisk*, 317 Ill. App. 3d 798, 802 (2000). At the time of the hearing on plaintiff's motion for a preliminary injunction, the trial court was aware that there was a criminal case pending against defendant.

When plaintiff called defendant at the hearing, plaintiff asked defendant questions aimed at obtaining information regarding whether she was certified as a midwife or licensed as a nurse; whether she had been hired and paid by the Verzis to assist as a midwife in the delivery of their baby; whether she was present and assisted in the delivery of Spencer Verzi in violation of the cease and desist order issued against her by the Department of Professional Regulation; and whether, after assisting in Spencer's birth, she told the Verzis that they should not tell anyone she was there because she should not have been present. Clearly, such questions compelled defendant to be a witness against herself in violation of the fifth amendment because the answers to the questions could be used in the criminal proceeding pending against her. In this instance, therefore, where defendant's answers might have incriminated her in future criminal proceedings, the trial court did not err in finding that it could not draw any negative inferences from defendant's invocation of her fifth-amendment privilege against self-incrimination in the present civil proceeding. See *Relsolelo*, 317 Ill. App. 3d at 802.

Based on the reasons given above, we reverse the judgment of the circuit court of McHenry County denying plaintiff's preliminary injunction by granting a directed finding in defendant's favor at the close of plaintiff's case in chief and remand the cause for further proceedings.

Reversed and remanded.

McLAREN and GROMETER, JJ., concur.